**PRICHARD v. NELSON et al.**

Civil Action No. 72.

District Court, W. D. Virginia, at Harrisonburg.

Dec. 9, 1942.

Rehearing Denied Dec. 30, 1942.

On a Motion as to the Contents of the Record on Appeal Feb. 23, 1943.

---

[4] Royalty Adjustment Act, § 1, 56 Stat. 1013, 35 U.S.C.A. § 89.

Joseph I. Nachman, of Staunton, Va. (Glenn W. Ruebush, of Harrisonburg, Va., on rehearing only), for plaintiff.

George S. Wallace, of Huntington, W. Va., for defendants.

PAUL, District Judge.

The plaintiff's cause of action is set out in detail in the complaint wherein the following is stated:

That on November 13, 1928, the plaintiff loaned to one H. A. Robson, now deceased, certain bonds of the United States of a par value of $65,000, due in 1954, and bearing 4 per cent interest, under an agreement that Robson would return the bonds on or before five years after the date of the loan, and would meanwhile pay to the plaintiff the interest coupons on the bonds as they matured, plus an additional 2 per cent of the par value of the bonds. To secure performance of this contract, Robson assigned to the plaintiff two contracts of lease, one of which was upon a one-half interest which Robson owned in certain property and from which the rental on such interest was $250 a month, and the other on property owned by Robson and

leased for $75 a month. Robson also executed a deed of trust upon his interest in the properties covered by the leases.

That on November 19, 1930, the plaintiff loaned Robson additional bonds of the same nature of the par value of $30,000 upon the same terms to be returned in two years. At that time Robson assigned to plaintiff a life insurance policy in the face amount of $50,000 as collateral security for any and all obligations due to plaintiff, and as additional security for this second loan executed a deed of trust on Robson's one-third interest in certain lands in Fayette County, West Virginia.

That during the summer of 1933, the plaintiff became doubtful as to the security for the $65,000 loan and threatened to take action for the return of the bonds unless further security was given. To meet this demand Robson, as principal, and Mary R. Nelson and C. P. Nelson (the defendants), as sureties, on August 7, 1933, executed and delivered to plaintiff a bond in the penalty of $77,500 conditioned upon the return, on or before January 1, 1934, of the $65,000 of bonds loaned to Robson on November 13, 1928.

That, when the agreed time came for return of the bonds the plaintiff made no demand for their return, nor did he extend the time, but permitted Robson to retain them because of the belief that if he pressed the matter and enforced the deeds of trust he (plaintiff) would probably have to buy in the properties on which they were given, which he did not wish to do. On September 25, 1935, the land in Fayette County was sold, and $30,000, being Robson's portion of the purchase price, was paid to plaintiff on account of the second loan of $30,000 of bonds secured on this land. With this fund the plaintiff, on September 26, 1935, purchased on the open market $25,000 par value of bonds of the series loaned. The prevailing price at that date was 109³⁰⁄₃₂ and this premium together with some accrued interest and commissions made the cost of these bonds $27,777.43. This left $2,222.57 in plaintiff's hands as a sinking fund for the payment of interest on the loan, no interest having been paid after the due date of the loan. The $25,000 of bonds purchased was credited on the obligation to return $30,000 of bonds and this left owing to the plaintiff $5,000 of bonds and some interest on the $30,000. That a statement of this transaction was furnished Robson.

That on May 8, 1939, Robson died and on June 25, 1939, there was paid to the plaintiff the sum of $50,669.30, proceeds of the insurance policy on Robson's life. The plaintiff deducted from this fund the sum of $2,139.22, which together with the $2,222.57 retained from the proceeds of the Fayette County land, and $280.56 advance interest, made $4,643.05 which was the interest accruing on the $30,000 obligation to September 15, 1935, and on the remaining $5,000 thereof to June 15, 1939. This left plaintiff with a balance of $48,529.38 from the proceeds of the life insurance and with this balance the plaintiff, on June 26, 1939, purchased on the open market at the then prevailing price $41,300 par value of bonds. The premium, accrued interest, commissions, etc., made these bonds cost $48,200.38 and left a balance of $329. Out of the bonds purchased the plaintiff credited $5,000 on the balance on the $30,000 loan, paying it in full; and he credited the remaining $36,300 of bonds on the $65,000 loan. That at the completion of this transaction there remained due to the plaintiff bonds in the amount of $28,700, balance on the first loan, subject to a small amount in plaintiff's hands as a sinking fund for future payment of interest. That a statement of this transaction was furnished Robson's executor.

That from the inception of these transactions plaintiff had been receiving the amount of the rents assigned to him aggregating $325 a month, until in June, 1939, at which time the obligations of Robson had been so far reduced as that the entire amount was not needed to meet interest on the balance due; and thereafter the plaintiff collected the rent on the one property of $250 a month. That this amount was more than sufficient to meet the interest charges and as a result the sinking fund accumulated so that as of December 15, 1940, there remained due to the plaintiff $28,700 of bonds subject to a sinking fund of $2,496.

That thereafter in a suit in the Circuit Court of Cabell County, West Virginia, taking the form of a general creditors suit to subject the lands of Robson to the liens thereon, there was paid to the plaintiff on September 24, 1941, the sum of $20,205.16. That this sum, together with the sinking fund then in hand amounting to $3,454.50, gave to the plaintiff $23,659.66. That this amount was sufficient to purchase bonds of a par value of $20,500 at the then market

price and leave a balance in the sinking fund of $255.63. That no other bonds have been returned to plaintiff and that as a result of all these transactions there remains due to the plaintiff bonds of the par value of $8,200 with interest from September 15, 1941.

For this balance the plaintiff now seeks to hold the defendants liable as sureties on the bond executed by them on August 7, 1933, for the performance of Robson's contract as heretofore described, and prays for judgment against defendants for a sum sufficient to purchase $8,200 of bonds at the market price prevailing on September 15, 1941, with interest from that date.

To this the defendants have filed their answer admitting the loans made to Robson, the nature of the securities therefor, the collections made from these securities, and the execution by defendants of the bond on which they are now sued as sureties.

However the defendants deny liability on grounds embodied in the following paragraph quoted from the answer:

"These defendants deny the right of the plaintiff to purchase United States Government bonds to replace the $65,000.00 bonds loaned by the plaintiff to the defendant on November 13, 1928, at the price and in manner set forth in said complaint and deny the correctness of the plaintiff's account as set out in said complaint but aver that all the matters and things set out and complained of in said complaint have heretofore been litigated in a court of competent jurisdiction in a suit wherein these defendants and plaintiff were parties and the identical questions set out in the plaintiff's complaint were litigated and resulted in judgment adverse to the plaintiff here."

The answer then alleges the course of certain proceedings in the Circuit Court of Cabell County, West Virginia, as a result of which it is alleged that all balances due by Robson to the plaintiff, growing out of these transactions, were determined and fully paid.

As will be seen, any liability on the defendants rests upon the obligation of the bond dated August 7, 1933, wherein they became sureties for the performance by Robson of the latter's contract to return to the plaintiff the $65,000 of U. S. bonds. The defenses offered to the instant action are that the plaintiff has received full satisfaction of all claims against Robson growing out of the contract between them and, further, that this has been determined by a court of competent jurisdiction; or more briefly (1) that the bond on which defendants were sureties has been satisfied, and (2) res adjudicata.

The controversy as to the amount due the plaintiff under his contracts with Robson grew out of the manner in which the plaintiff applied or credited the amounts which were paid to him at various times by Robson or Robson's estate from the proceeds of the several properties securing the loan, as set out in the complaint. It does not appear that at any time there was actual return in kind of the bonds loaned. Instead the plaintiff received payments of money from the sale of land, from the insurance policy etc., and as the plaintiff received these payments from time to time he used them to purchase bonds at the *then* market price; and he then credited Robson, not with the amount of the payment which he (the plaintiff) received, but with the par value of the bonds which he purchased on the market with the payments. At all of these times the market price for the bonds was at a noticeable premium, having steadily increased since the time of the loan; and as a consequence the par value of the bonds purchased and for which Robson received credit was substantially less than the payments received by the plaintiff from Robson. These transactions are set out in the complaint hereinbefore quoted.

Prior to May, 1940, the plaintiff had received (in 1935) $30,000 as the proceeds from Robson's interest in the Fayette County land and (in 1939) $50,669.30 from the life insurance policy assigned by Robson. With the first of these payments the plaintiff had purchased $25,000 of bonds and from the second $41,300 of bonds. As set out in the complaint, this left owing to the plaintiff $28,700 of bonds. Robson had died in May, 1939, and thereafter the claims of the plaintiff as to the balance due him growing out of this transaction became involved in a suit which was then, and had been for several years, pending in the state court of West Virginia.

The parties in the instant case have stipulated that the defendants' plea of res adjudicata is dependent upon the effect of the proceedings taken in the West Virginia suit. Their stipulation sets forth certain steps taken in the course of that suit and stipulates that copies of certain plead-

ings and exhibits, decrees, reports, affidavits and other papers filed in that suit shall be received and considered here to the same effect as if legally certified. The papers so to be received are designated in the stipulation and the copies thereof exhibited. From these the following appears.

In April, 1934, a chancery suit had been instituted in the Circuit Court of Cabell County, West Virginia, by F. O. Lamb, Receiver of Huntington Bank & Trust Company, as plaintiff, the general purpose of which was the liquidation of the affairs of a corporation named the Huntington Securities Company, including an accounting of the latter's properties, of the liens thereon, and of all its indebtedness, direct or contingent; and an application of its assets to the payment of its debts. There were a large number of defendants named in this suit, having various interests in its subject matter; including H. A. Robson and other individuals who had become sureties on bonds executed by Huntington Securities Company or were otherwise involved.

This litigation became complicated and long drawn-out and had many ramifications. In August, 1934, the State of West Virginia was allowed to intervene as a plaintiff and filed its petition naming a number of defendants in addition to the original ones, all of whom were brought in by process, including the plaintiff in the instant case, who was made a party in his own right and in several representative capacities, and including also the defendants in the instant case. Robson seems to have been one of the few individual defendants in the suit who possessed substantial assets and the petition of the State of West Virginia, which was treated as an amended bill, prayed, among other things, that there be an accounting of all of the real estate owned by Robson and of all lien debts thereon and the order of their priority; and that certain conveyances of real estate theretofore made by Robson to Mary R. Nelson and C. P. Nelson (defendants in the instant case) be set aside as fraudulent and void.

Prichard, on May 6, 1935, filed an answer to the amended bill in which, among other things, he set out his claim against Robson arising out of the loan of the $65,-000 of bonds, no part of which had at that time been repaid. Because of the many complications of this litigation, which are without bearing on the questions here and need not be discussed, no steps were taken for a judicial ascertainment of the debts of Robson until March 7, 1940. On this date a decree was entered which, after reciting the death of Robson (which had occurred in 1939), referred the matter to one L. W. Blankenship, a commissioner in chancery, with directions to state and report, among other things, an account of all the property of "the late H. A. Robson" and of the liens thereon and their priorities.

The commissioner proceeded with the execution of this reference and among the claims presented and upon which he heard evidence was that of Prichard. Prior to this time Prichard had received (in 1935) the $30,000 from the sale of Robson's interest in the Fayette County land and (in 1939) the $50,669.30 from the insurance on Robson's life. The claim which he presented to the commissioner was for the balance which he alleged was due him. The claim was first filed as for money due in the principal sum of $26,204, but was later amended in the form of a claim for bonds in the par value of $28,700, subject to what the creditor termed "a sinking fund" of $2,496. It will be noticed that this is the same form and in the same amount as the complaint in the instant case alleges the debt as of December, 1940. An examination of the commissioner's report shows that the claim of Prichard presented before him was based on exactly the same method of applying credits as is set out in the instant case, i. e. by use of the money paid to Prichard to buy bonds at the premium market price and giving credit only for the par value of the bonds so purchased. In other words, the claim asserted by Prichard against Robson's estate was based on the same figures and the same method of bookkeeping as the claim now asserted against defendants here as Robson's sureties. Prichard's claim, as originally filed before the commissioner, was supported by his affidavit; and the amended claim by the affidavit of his counsel. There seems to have been controversy not only as to the amount due on Prichard's debt, but also as to whether the instrument executed by Robson on November 13, 1928, had the effect merely of assigning the leases on the property described in it or whether, as contended by Prichard, it also created a lien upon the reversion in the property. Objections to Prichard's claim were filed be-

fore the commissioner by counsel for several parties in interest, including C. P. Nelson. These objections denied that Prichard had a lien on the corpus of the real estate and they also raised the specific question as to the amount due Prichard growing out of the manner in which he had applied the credits on his debt, and it was insisted that the amount due was less than asserted by Prichard.

The commissioner considered carefully and at length the claim asserted by Prichard and the objections raised thereto. His report recites the facts about the loan of the bonds to Robson, the payments made on account thereof and the manner of application of such credits. Seemingly all parties treated the transaction as obligating the return of the $65,000 of bonds in kind, but question was raised as to the time at which and the price for which Prichard purchased the bonds which he credited on the obligation. The commissioner held that, inasmuch as the obligation was to return the bonds within five years, the default occurred as of November 13, 1933, and that Prichard should have exercised his right to purchase bonds on the open market within a reasonable time after such default. Authorities are cited for this position and on the question of what constituted a reasonable time and, as a result, the commissioner held that any time over two months was unreasonable. He further found that the highest market price of the bonds, during the two months following November 13, 1933, was 104.44 and that Robson should have been credited on the basis of this price rather than on the basis of 116.50, the price of the bonds in June, 1939. On this basis the commissioner recast the credits allowable to Robson's estate and found that the amount due Prichard was $22,029.34 as of May 15, 1941. Exception to the commissioner's findings was taken by Prichard and these findings were sustained by a decree of the Circuit Court of Cabell County entered July 1, 1941, and judgment was entered in the amount found. By a further decree of September 24, 1941, the court directed the amount of the Prichard debt to be paid out of funds in the hands of Geo. S. Wallace, Special Receiver, the amount then being subject to a further credit of $2,295 which had been collected by Prichard from the rents assigned him. On September 24, 1941, the sum of $20,205.16 was paid to Prichard's attorney and receipted for by the latter as in full settlement of the judgment against Robson.

On their answer, supported by the exhibit of the foregoing record, the defendants ask a summary judgment in their favor.

It is seen that all questions as to the liability of Robson growing out of this transaction have been heard and determined by a court of competent jurisdiction. The judgment rendered by the West Virginia court was not appealed from; the amount adjudged due was paid and accepted. The question is whether Prichard can now maintain an independent suit against Robson's sureties in an effort to collect from them the remainder of the amount which he unsuccessfully asserted against Robson. So far as Robson's estate is concerned the judgment of the West Virginia court is certainly final. In that proceeding there was a definite and final determination of the amount which Robson owed and this amount was paid and accepted as being in full settlement of the judgment. Our question in the instant case may then be restated thus: Can a creditor collect from a surety a sum in excess of that which has been judicially determined to be the amount owed by the principal debtor?

The plaintiff insists that the doctrine of res adjudicata does not apply here because, as he asserts, the estoppel created by the adjudication was not mutual; that the adjudication was not upon such an issue, or between such parties, as that it was binding on the defendants here and therefore could not bind the plaintiff. He invokes the expression, frequently used, that before a judgment can be res adjudicata and used as a shield it must be such that had the judgment been the other way his adversary could have used it as a sword. He points out that the litigation in West Virginia in no way involved the bond on which defendants were sureties and on which their obligation arises; that the suit was not on the bond and that the bond was not even mentioned in that litigation. It is argued that if Prichard had prevailed in his contention before the West Virginia court as to the amount due him and had been unable to collect from Robson and thereafter sued Nelson as surety on the bond, the latter would not have been barred from setting up any proper defense. That Prichard could not have set up the former proceedings as res adjudicata in his favor. And that therefore, and because the estoppel must be mutual, the defendants

cannot invoke such defense here against Prichard.

As to this it may be said, in the first place, that the assertion of lack of mutuality of estoppel is open to serious doubt. It is to be remembered that the defendants here were parties to the proceedings in West Virginia and that C. P. Nelson appeared before the commissioner and actively participated in opposition to the plaintiff's claim and that one of the grounds of opposition was as to the amount of the claim, which is the only matter in issue here. Therefore, when both parties to this action appeared in the West Virginia suit and actively litigated this particular issue, it is difficult to see why the judgment rendered on this issue is not equally binding on both.

■■ However, the question of whether the defendants are or might have been estopped by the judgment in the prior proceeding is not before the court and need not be, and is not, decided here. The question is whether plaintiff is estopped and, contrary to the assumption of the plaintiff, this is not dependent on mutuality of estoppel. The rule invoked by plaintiff is a general one to which, like many other general rules, there are exceptions.

In Bigelow v. Old Dominion Copper Co., 225 U.S. 111, 127, 32 S.Ct. 641, 642, 56 L. Ed. 1009, Ann.Cas.1913E, 875, it is said that while it is a principle of general elementary law that the estoppel of a judgment must be mutual—

"An apparent exception to this rule of mutuality has been held to exist where the liability of the defendant is altogether dependent upon the culpability of one exonerated in a prior suit, upon the same facts when sued by the same plaintiff. See Portland Gold Mining Co. v. Stratton's Independence, 8 Cir., 158 F. 63, 16 L.R.A.,N.S., 677, where the cases are collected. The unilateral character of the estoppel of an adjudication in such cases is justified by the injustice which would result in allowing a recovery against a defendant for conduct of another, when that other has been exonerated in a direct suit. The cases in which it has been enforced are cases where the relation between the defendants in the two suits has been that of principal and agent, master and servant, or indemnitor and indemnitee."

The rule thus stated has become well recognized in the law. See 34 C.J. p. 988; 30 Am.Jur. p. 975; 15 R.C.L. 956. And see Portland Gold Mining Co. v. Stratton's Independence, 8 Cir., 158 F. 63, 16 L.R.A., N.S., 677, where many applications of this principle are cited.

The doctrine has been applied frequently in actions for damages where exoneration of the servant has been held to bar an action against the master; or similarly as affecting agent and principal. But it is also held to apply in cases of principal and surety to the exoneration of the latter, and to other cases where claims are asserted against those secondarily liable. In the note to Portland Gold Mining Co. v. Stratton's Independence, 16 L.R.A.,N.S., 677, it is said:

"It may be stated, however, that it seems to be well settled that, where the relation between two parties is analogous to that. of principal and agent, or principal and surety, or master and servant, a judgment in favor of either, in an action brought by a third party, rendered upon a ground equally applicable to both, should be accepted as conclusive against the plaintiff's right of action against the other."

In Gill v. Morris, 11 Heisk., Tenn., 614, 27 Am.Rep. 744, the court had before it the question of the liability of a surety on a note where a suit against the maker had failed. The contention was there made by the plaintiff that in order for the former judgment to be a bar it must have been in a suit between the same parties or their privies. The court, conceding that under the common law the surety is not the representative or privy to the principal debtor and that the former judgment was res inter alios acta, concludes however:

"It is obvious that if the rule of res inter alios acta is applied to a case in which the principal has been discharged, there may be a judgment against a surety who will either have no indemnity against his principal, or if he has, then the principal will be indirectly subjected to a liability from which he had been legally discharged. In view of the difficulty in harmonizing the conflict between the two rules in the case stated, the editor of the Am.Lead.Cases, vol. 2, p. 440, says: 'Hence, while the estoppel of the judgment, viewed solely as a judicial sentence, will be confined to the parties between whom it is rendered, it will, notwithstanding, have the same effect as any other transaction which gives the principal rights inconsistent with those which the creditor seeks to enforce against

the surety, and will constitute a defense which would always have been good in equity, and which should now be sustained in a court of law.'

"The result is, that when suit is brought against a surety for a debt from which the principal has been discharged by a court of competent jurisdiction, the surety is entitled, upon proof of the fact of valid discharge, to rely upon the judgment of discharge as an estoppel; and this must be regarded as an exception to the general rule of res inter alios acta."

In Spencer v. Dearth, 1870, 43 Vt. 98, a judgment in favor of a surety on a note on a plea of payment was held to be conclusive in an action against the principal maker. The court said:

"A rule that would not allow a judgment in favor of one of the makers of the note, upon such defense, as a legal bar to a recovery against another maker of the same note, would compel each maker of the note, in a suit subsequently tried against him, to litigate the same question or questions which had been adjudicated in the former suit or suits, irrespective of the former adjudication or its result, by which the plaintiff would have had the advantage of two or more trials in different suits, but of the same matter and if he should finally prevail against one of such makers he would have had only one trial and judgment upon the matters involved."

The West Virginia statute (Code, Sect. 4307) and the cases cited by the plaintiff are not applicable to the situation here. They are to the effect that a surety or other person secondarily liable is not bound by a judgment obtained against the principal debtor in an action to which the surety was not a party. They rest on the basic principle that every party is entitled to his day in court and to be given an opportunity to present his defense. That is a different thing from giving a plaintiff the right to repeated litigations of the same issue against one after another of a number of defendants. The fact that every defendant is entitled to his day in court does not imply that a plaintiff is entitled to two days in court, or to as many days as there are persons whom he can find to sue, when his only object is to try in each successive case the identical issues which he has tried in the first.

The fact that the West Virginia litigation was not based on the bond on which defendants were sureties does not alter the situation. The bond was given as security for the performance of a contract. The plaintiff, deeming Robson solvent (which he was), did not proceed against the sureties on the bond but against Robson on the contract. The full extent of the obligation of Robson was determined and was paid. The attempt in the instant case is, by a suit on the bond, to relitigate exactly the same question already settled in the West Virginia case, namely, the extent of Robson's liability.

In this connection the language of the court in the recent case of Aetna Casualty & Surety Co. v. Leroy Abbott, 4 Cir., 130 F.2d 40, 42, is applicable. That suit was to recover under a liability policy issued by defendant in favor of a bank where a judgment previously obtained against the bank remained unpaid by it. The defendant insurance company, admitting that it had defended the previous suit on behalf of the bank, contended that it was not bound by the judgment against the bank because the coverage of the policy issued by it had not been involved in the prior suit. To this the court said:

"The answer is that the facts upon which coverage depends were involved in that action, and the facts asserted here as a defense with respect to coverage were asserted there as a defense to a recovery against the bank. Even though there be a difference of issues, defendant is bound as to facts actually litigated and determined," citing National Bondholders Corp. v. Seaboard Citizens Bank, 4 Cir., 110 F.2d 138, 143.

Applying the quoted language to the instant case, it need only be pointed out, that the facts upon which liability on the bond depends are the same facts involved in the suit against Robson; and the facts upon which plaintiff relied in the suit against Robson are exactly the same as he relies upon here in his effort to recover on the bond.

While the plaintiff rests his right to maintain this suit upon the alleged lack of mutuality of estoppel and argument has been directed to the application of that doctrine, the case falls also within the simpler principles of the law relating to principal and surety.

In 21 R.C.L. 1085, it is said:

"As the liability of a surety cannot exceed that of his principal, where the

amount has been fixed by a judgment at law against the principal, it forms the rule to determine the sum to be recovered against the surety * *"

And (p. 1091) it is further stated:

"It is a well recognized rule that the sureties on an obligation may, in an action against them, make use of a judgment in an action against their principal as a defense, when the judgment was in his favor, such judgment, if adverse to the plaintiff, being conclusive in favor of the sureties, or in any event it is conclusive as to the extent of damages which he may recover against them."

To the same effect, see 50 C.J. 92.

In the case of United States v. Allsbury, 4 Wall. 186, 18 L.Ed. 321, which seems directly in point, the United States had sued the principal and one of the sureties on a bond and had obtained judgment in a sum less than that claimed. It later sued the other surety (Allsbury) for the larger amount. In holding that the defendant's liability was limited to the amount of the prior judgment, the court said:

"It is unnecessary to refer to authorities to show that the liability of the surety cannot exceed that of his principal; and that amount having been fixed by a judgment at law, it formed the rule to determine the sum to be recovered in this suit. The verdict and judgment were competent evidence on behalf of the surety for this purpose; indeed, the highest evidence of the fact."

To the same effect, see Central Trust Co. v. Manly, 5 Cir., 100 F.2d 992.

In Norris v. Pollard, 75 Ga. 358, the rule is thus expressed:

"* * * and it is equally clear that the surety is liable for no greater amount than is found to be due from the principal; his liability cannot be extended beyond that of his principal. This follows from the very nature of the contract."

See also State v. United States Guarantee Co., 207 N.C. 725, 178 S.E. 550, 553; Chozen Confections v. Johnson, 218 N.C. 500, 11 S.E.2d 472; Gurnee v. Bausemer Co., 80 Va. 867; and annotation 5 A.L.R. 594 citing various cases.

There can be no question of the general rule, and while certain cases are apparently to the contrary, it is believed that in these it will be found that the release of liability of the principal arose out of a defense of a personal character or where the extinction of his obligation arose from a cause originating in the law. Such cases have been said to constitute exceptions to the rule that the liability of the principal measures the liability of the surety. Of course no such condition exists here. The sole question in the West Virginia case and here is the amount for which Robson was liable. This amount was adjudged in the former case and the judgment paid. The bond on which defendants were sureties was given to insure the performance of Robson's obligations under his contract. Liability on the bond arose only when performance on the contract was in default and only to the extent in which Robson failed to meet his obligations. This amount was judicially determined and paid. As between the plaintiff and the principal debtor no default exists. Robson's obligations have been fully satisfied. No basis for recovery on the bond exists.

Defendants motion for summary judgment on the pleadings will be granted.

### On a Petition for Rehearing.

By an order of the 9th of December, 1942, a motion of the defendants for summary judgment in their favor was granted and judgment entered in favor of the defendants for reasons which the court then set forth in a written opinion filed as a part of the record.

The plaintiff has now presented a petition for rehearing. It appears that counsel originally representing the plaintiff is no longer connected with the case. And while the plaintiff is now represented by counsel, the presentation of the petition for rehearing and the argument thereon has been made by the plaintiff in his own person.

The order of this court of December 9, 1942, was based upon the pleadings in the case, together with the exhibits filed in connection therewith, upon a stipulation of the parties entered into and filed as a part of the record and on the arguments of counsel. As made up by the pleadings and the stipulation, it was agreed and it clearly appears that the defendants' plea of res adjudicata depended upon the effect of a judgment obtained by the plaintiff against H. A. Robson in the Circuit Court of Cabell County, West Virginia, in July, 1941, which judgment was paid to the plaintiff. No question was raised as to the validity of this judgment nor to the jurisdiction of the court in which it was rendered, but the sole question was wheth-

er this judgment had the effect of barring a further proceeding by the plaintiff against C. P. Nelson and Mary R. Nelson as sureties on a bond which they had executed to secure the payment of a debt owing by H. A. Robson to the plaintiff.

The petition for rehearing which has now been filed is somewhat lengthy and a considerable part of it is devoted to pointing out the alleged errors by which the West Virginia court arrived at the amount of the debt owing by Robson to the plaintiff and in the contention that the amount actually owing was larger than the amount for which judgment was rendered. This amounts to an effort to retry the issues which were before the West Virginia court and which this court has already refused to retry for the reasons stated in the opinion rendered on December 9, 1942.

However, the petition for rehearing asserts this further ground, which could be the only one set forth in it which would justify the court in granting a rehearing, and that is that the judgment entered by the West Virginia court in July, 1941, is a void judgment and presumably, therefore, not available to the defendants as a bar to this proceeding. This, of course, is something entirely new. At no time during the hearing of this case has it heretofore been suggested that the judgment of the West Virginia court was void. In fact, all parties acknowledged the jurisdiction of the West Virginia court. They did not question the regularity of the proceedings therein and raised only a question as to the effect of the judgment of the West Virginia court as a bar to a suit against the defendants on their bond. The effect of the petition for rehearing, therefore, is to bring forth an entirely new contention and to assert an attack on the sufficiency of the defendants' plea from an entirely new standpoint, and from a standpoint no suggestion of which has heretofore been made in the case.

The reasons now asserted for contending that the judgment of the West Virginia court was void are the following: It is pointed out that during the course of the proceedings in the West Virginia court to which H. A. Robson was a defendant Robson died and, following the usual procedure, a motion to revive the suit was made by his widow, his heirs and executors. Attention is called to a statute of the State of West Virginia relating to

motions for revival of suits against persons dying during their pendency, and it is claimed that the effect of this statute is such that any judgment thereafter rendered should have been rendered against the widow, the heirs and executors of Robson, who made the motion for revival; whereas it is asserted that the judgment was in fact rendered against "the estate of H. A. Robson". The alleged invalidity of the judgment, therefore, rests on the assertion that it was rendered against "the estate of H. A. Robson" instead of against his widow, heirs and executors by name. It is admitted that no question as to the form of the judgment was raised at the time of its rendition nor at any time thereafter in the West Virginia court and that the plaintiff received payment of the judgment and receipted in full for its settlement. Now for the first time has any question been raised that the judgment was invalid.

Without attempting to construe the effect of the West Virginia statute to which the plaintiff refers, it is quite plain that the highly technical distinction which he seeks to raise did not render the judgment void and thereby render it subject to collateral attack. At most, and which appears extremely doubtful, the judgment was voidable only. A judgment is not void merely for some irregularity or error as to the form in which it is entered. If a judgment is rendered by a legally organized court which has jurisdiction of the subject matter and of the parties and power to render the particular judgment, it is not void because of some irregularity of the proceedings or in the form of the judgment itself. A judgment rendered under such conditions unless reversed or annulled in a proper proceeding prosecuted directly for that purpose is not open to contradiction or impeachment in respect to its validity, verity or binding effect by parties to it in any collateral proceeding except for fraud in its procurement. See 34 C.J. 511, 514, 563 and various other authorities to the same effect.

There is another principle also which is pertinent here and which rises to bar the plaintiffs petition for rehearing on the ground asserted. The judgment in the West Virginia court was obtained by the plaintiff in the prosecution in that court of his claim against Robson. Having obtained the judgment, he accepted payment of it in full without appealing from the

judgment of the court in which it was rendered. It is well recognized that a party who has secured the rendition of a judgment or has taken the benefits thereof is thereafter estopped to attack the validity of the judgment. See 31 Am.Jur. Page 180.

As stated in the case of Merritt's Lessee v. Horne, 5 Ohio St. 307, 67 Am.Dec. 298, 301: "There is now no principle better settled, or resting upon firmer grounds of justice and public policy, than that which precludes a party who has induced another to part with his money or property, and has taken the fruits of a judicial proceeding, from afterwards questioning its regularity."

The rule is again stated in an annotation in 3 A.L.R. 535 as follows: "The party at whose instance a judgment is rendered is not entitled in a collateral proceeding to contend that the judgment is invalid. Neither want of jurisdiction, defect of procedure or any other ground of invalidity can be availed of collaterally by the party who is responsible for the existence of the judgment".

For the reasons above stated the petition for rehearing is denied.

### On a Motion as to the Contents of the Record on Appeal.

In this action the plaintiff has given notice of an appeal from a judgment on the pleadings heretofore entered in favor of the defendants and has designated in a notice to the clerk of the court those portions of the record which the plaintiff desires to include in the appellate record.

And the plaintiff has included in such designation a petition for rehearing which was filed before this court by the plaintiff on December 19, 1942, the order of the court of December 29, 1942, denying such rehearing and the memorandum opinion of the court filed at the time of such denial.

■ The defendants have now submitted a motion that the record on appeal being prepared by the clerk of the court be corrected by striking therefrom the matter just above mentioned on the ground that they are proceedings subsequent to the final judgment of the court, entered on December 9, 1942, and are not a part of the record in the case and should not be included in the record on appeal. It is alleged that the so-called petition for a rehearing is in fact a motion for a new trial and that the

denial of a motion for a new trial is not appealable. If the defendants' motion were granted, its effect would be to exclude from the record on appeal all matters subsequent to the order of December 9, 1942, which granted judgment in favor of the defendants.

No sound reason is seen why the motion of the defendants should be granted and there appear to be good reasons why it should not be granted. It is true that what the plaintiff designated as a petition for rehearing was in substance a motion to set aside the judgment of the court and grant a new trial or new hearing to permit the plaintiff to introduce new matter which had not been introduced or mentioned in the hearing of the case and to raise new contentions of law which the plaintiff had not raised or mentioned in the original hearing of the case. There are at least two reasons why this court felt that no rehearing or new trial, whichever it may be called, should be granted:

(1) The matter which plaintiff desired to introduce at a new trial had it been granted is matter which had been within his knowledge long prior to the time of the hearing at which judgment was entered and which he simply failed to offer at the time of such hearing and placed no reliance on.

(2) The contentions which the plaintiff desired to raise for the first time on a rehearing were without merit in themselves.

This court is satisfied that for the reasons stated it acted correctly in not granting a rehearing or a new trial, whichever it may be called. But that does not mean that its action in this respect is not subject to review.

■ The defendants are in error in their contention that under no circumstances is denial of a motion for a rehearing or for a retrial reviewable by an appellate court. It is ordinarily said that the granting of a new trial is within the sound discretion of the trial court, and it is sometimes loosely said that the action of the court in this respect is not reviewable. It is true also that appellate courts will not ordinarily review the action of a trial court in refusing a motion for a new trial on questions of fact. But the discretion that the trial court has in refusing a motion for a new trial is a discretion which must be soundly exercised, and when abused or exercised in an arbitrary manner

may be reviewed. And when the question on which the motion for a new trial is based is a question of law, the action of the trial court is undoubtedly subject to review.

The effect of the defendants' motion would be to exclude from the record in the appellate court all mention of a motion made by the plaintiff following judgment, which the plaintiff had a right to make, as well as any mention of the action of the court on said motion. Carried to its logical conclusion, a motion such as that now made by the defendants would limit every record on appeal to the judgment entered by the court no matter what might have transpired thereafter in the efforts of an appellant to show that that judgment was erroneous. It is certainly doubtful that any trial court has authority to so limit the appellate record or to exclude anything therefrom which shows happenings which actually took place in court and which an appellant desires. to present to an appellate court.

This court has no desire to prevent an appellant from presenting to the appellate court for its review any happening whatever that may have taken place in the course of the proceedings in the lower court. and it does not think it would have the authority so to do even if it were so inclined. If the appellant here has included in the record any matter not properly there, the appellate court will no doubt disregard it and by its power to allocate costs can penalize its improper inclusion in the record. It is true also that the appellate court has the power to correct the record before it if it chooses by excluding from consideration any part thereof. The motion of the defendants will be denied.