# Richmond

AETNA CASUALTY & SURETY COMPANY v. WELDON A. PRICE.

January 17, 1966.

Record No. 6067.

Present, Eggleston, C. J., and Buchanan, Snead, I'Anson, Carrico and Gordon, JJ.

*Charles H. Duff* (*Duff & Slenker*, on brief), for the plaintiff in error.

*Robert L. Ellis* (*Anthony J. Siciliano; John J. Daly; Paul F. Sheridan; Sicialiano & Daly* on brief), for the defendant in error.

CARRICO, J., delivered the opinion of the court.

In this writ of error, we are called upon to decide, for the first time, the question of the liability of an insurance company for its refusal to settle a claim against its insured for an amount within the policy limits where a judgment in excess of such limits is thereafter secured against the insured.

The situation before us developed in the following manner:

Dr. Weldon A. Price, a pediatrician practicing in Arlington County, carried a Physicians', Surgeons' and Dentists' Professional Liability Coverage policy with Aetna Casualty and Surety Company, with a $50,000 limit of liability for each claim, or $150,000 in the

aggregate. The policy period was for one year from August 12, 1953.

On November 2, 1953, a baby girl, Michele Neyland, was born to Mr. and Mrs. Herbert M. Neyland in Arlington Hospital. Mrs. Neyland was attended at the birth and prior thereto by Dr. Donald C. McCollum, and his partner, Dr. Charles K. Latven.

The child came under the pediatric care of Dr. Price, although his partner, Dr. Robert H. Detwiler, first saw and examined the infant girl immediately after her birth.

On October 25, 1956, an action was instituted in the United States District Court for the District of Columbia by the infant, Michele Neyland, by John F. Nieman, her next friend, and by her father in his own right against Doctors McCollum, Latven, Detwiler and Price.

The complaint filed in that action alleged that the child had "contracted a destructive blood disease known as 'erythroblastosis fetalis,' suffering extensive damage to her brain and nervous system, as a direct and proximate result of the negligence and carelessness" of the four doctors. The basis of the negligence charged against the doctors was that they had failed to give the child a necessary exchange blood transfusion immediately after her birth. The action sought $200,000 in damages for the infant and $80,000 for her father.

Only Dr. McCollum, who was a resident of the District, and Dr. Price, who had privileges in the District hospitals, were served with process in the Neyland action. Aetna, which carried malpractice insurance on all four doctors named in the action, employed John L. Laskey, a member of the District bar, to represent Doctors McCollum and Price. The doctors denied all responsibility for the child's condition and all liability for the claims asserted against them.

The case was not brought to trial until February, 1962. Before the trial commenced, the court, upon its own motion, dismissed the two unserved doctors from the case. Upon motion of Mr. Neyland, the *ad damnum* clause in his claim was increased from $80,000 to $280,000.

The jury returned a verdict in favor of Dr. McCollum. However, verdicts were returned against Dr. Price in the amounts of $20,000 on the infant's claim and $100,000 on the father's claim. The verdicts were approved by the court in its final judgments. On appeal, the judgments were affirmed.

Aetna, pursuant to an order of the District Court, paid into the registry of the court $20,000, plus interest and costs, to cover the

$20,000 judgment and $50,000, plus interest and costs, to apply on the $100,000 judgment.

Thereafter, Dr. Price brought an action against Aetna in the Circuit Court of Arlington County, seeking to recover the sum of $50,000, representing the balance due by him on the District of Columbia judgment. His motion for judgment, in the Arlington action, was based upon Aetna's alleged negligence and bad faith in refusing to settle the Neyland claims against him for $45,000, an amount within the limits of his policy.

Aetna filed grounds of defense denying liability for Dr. Price's claims. A jury trial was held which resulted in a verdict against Aetna in the sum of $50,000, which was approved by the trial court in its final judgment. Aetna was granted a writ of error.

In the trial court, there was introduced into evidence, as an exhibit, a "Joint Appendix," containing the relevant testimony in the trial of the case of *Neyland* v. *Price* in the District of Columbia. From that testimony the sad story of Michele Neyland is unfolded.

Michele's mother, Susanne Neyland, had Rh negative blood while her father, Herbert Neyland, had Rh positive blood. A child born of parents with such a difference in the Rh factor in their blood may be harmfully affected by such incompatibility.

Usually, where such a blood incompatibility exists, there is no difficulty in the first or second pregnancies. However, as a result of a previous birth of an Rh positive baby to an Rh negative mother, a subsequent child may be affected if its blood is also Rh positive. This is so because, in the earlier pregnancy with the Rh positive baby, the blood of the Rh negative mother becomes sensitized. When so sensitized, the mother's blood produces an antibody, or a protein substance which "is a protective mechanism on the part of the mother to protect herself against the red cells of the child." When the red cells of the Rh positive baby get into the circulation of the Rh negative mother, "they are foreign red cells to the mother and the mother tries to protect herself against these red cells and then produces this antibody which in turn destroys the red cells."

If the Rh negative mother, having once given birth to an Rh positive baby, is later pregnant with another Rh positive child, her blood sensitivity may increase. This is due to the activity of the antibodies in the mother's blood as they attack and destroy the red blood cells of the unborn infant.

A child born of an Rh negative mother and an Rh positive father may have either Rh negative or Rh positive blood. It is possible, by

conducting pre-natal blood examinations of the parents, to determine their Rh blood type, to predict the Rh blood factor of the child and to gain an indication as to whether the baby might be adversely affected by the Rh incompatibility of the parents.

One of the examinations, known as a zygosity test, is performed on the father's blood. His Rh positive blood may fall into one of two main blood groups. The first is heterozygous Rh positive, "which means that there is a roughly 50-50 chance that the child may inherit the father's Rh-positive blood type. There is an equal chance that the child may take after the mother and be Rh-negative." The second group is homozygous Rh positive in which "every one of those children would have to inherit the father's Rh-positive blood type."

Examination of the pregnant Rh negative mother's blood will disclose if there is an increase in her blood sensitivity caused by the activity of the protective antibodies developed by her. Such an increase indicates the presence of an Rh positive fetus and is "presumptive evidence that the baby may have trouble."

The trouble which the new-born baby may have, if it is Rh positive, is the disease of erythroblastosis fetalis. This is a disease "in which an excessive destruction of red blood cells in the infant occurs." The disease may cause anemia, jaundice, brain damage, cerebral palsy and even death. If the destruction of the new-born child's red cells causes jaundice, there may be an accumulation of bilirubin, the blood pigment, in the tissues of the baby. If this accumulation becomes excessive, "the toxic effect of this jaundice pigment, the bilirubin, can affect the cells of the brain to such a degree that they will be incapacitated and may even die."

When the child's brain cells, those located in the stem of the brain, are affected by the jaundice pigment, a condition known as kernicterus, which is a form of cerebral palsy, may result from erythroblastosis. Kernicterus "is a disturbance of the growth processes within the brain and . . . the child suffering from such a condition will have mental retardation."

The possible presence of the disease of erythroblastosis in a newborn child may be discovered by what is known as the Coombs test, performed on the infant's blood. A positive result of the test "means that you have to be careful and to do some more tests." A negative result evidences that the disease does not exist and "means that you have no problem."

Erythroblastosis also evidences its presence by a number of symp-

toms, appearing in the first five or six days of life of the new-born baby. These symptoms are: anemia; jaundice, usually appearing within the first twenty-four to thirty-six hours after birth; enlargement of the spleen or liver; respiratory difficulty; lethargy; weak cry; weak sucking reflex; spasms of the muscles in the back, and choreoathetoid, or wormlike, movements of the extremities. The presence of jaundice, which is the most significant symptom, can be observed clinically and its severity may be determined by a serum bilirubin test. Such a test was "not done in" Arlington Hospital in possible erythroblastosis cases in 1953, however, according to the hospital pathologist, because "its application to this disease entity is a recent development."

Medical witnesses who testified in the Neyland trial agreed that an exchange transfusion of the blood of a new-born infant suffering from erythroblastosis is the proper method of treating the disease. In such a transfusion, most of the infant's sensitized blood is removed and replaced with compatible blood. It is important, however, that such transfusions be "given early and repeated as necessary." But the exchange transfusion "is sometimes a hair raising experience," and can cause severe complications or even death of the child.

Michele was the third child of Mr. and Mrs. Neyland. Their first two children were born without defects resulting from the Rh incompatibility in the parents' blood.

During her third pregnancy, however, Mrs. Neyland encountered difficulty toward the end of her term. Approximately one month before Michele was born, a test of the mother's blood showed "a rising RH antibody titer," which meant "that her blood cells [were] producing an antibody which . . . [could] be unfavorable to her new-born" child. Another test conducted some time later showed that "there was a rise in her antibodies. There were more on this blood examination than on a previous one."

On October 30, 1953, blood was again withdrawn from Mrs. Neyland for another test. When Dr. Latven received the results of the test on November 2, and found that "the antibody titer was even higher," he telephoned Mrs. Neyland "and insisted she come in to the hospital for an induction of labor."

Dr. Latven delivered Michele at Arlington Hospital on November 2, 1953. He withdrew blood from the new-born baby's umbilical cord and ordered it subjected to a Coombs test. The test was conducted by Dr. William Dolan, the pathologist at Arlington Hospital. The results of the test were negative and Dr. Latven "was quite

happy about that." The blood was also tested for the Rh factor and the results showed that it was Rh negative.

Dr. Detwiler was in the hospital when Michele was born. A nurse asked him to see the baby because she had "spit up some *mucuous*, as many babies frequently do." He examined Michele and, to him, she "appeared normal."

Dr. Price visited the hospital the next day, November 3, and examined Michele. He inspected the baby's chart and noted that the mother had had a "rising titer," which alerted him to the possibility that he "might have an erythroblastotic baby." He saw that the report of the Coombs test showed that its results were negative.

Dr. Price conducted a "complete examination on the baby," after which he noted on her chart "normal female infant, no evidence of birth injury or congenital defect." He reported to Mrs. Neyland that Michele was "a normal, healthy, little girl."

Michele had none of the symptoms of erythroblastosis within the first five or six days, except that on November 4, fifty hours after her birth, she developed jaundice. Dr. Price examined the child, conferred several times with Dr. Dolan about her condition and diagnosed it as physiologic jaundice, which occurs "frequently in newborn infants," as opposed to pathologic jaundice. He ordered the injection of clysis, a fluid "to go under the skin to help clear up the jaundice." An exchange transfusion was not performed because Dr. Dolan "did not think an exchange transfusion was indicated."

Michele was discharged from the hospital on November 7, at which time she was still jaundiced. Mrs. Neyland, at Dr. Price's direction, reported periodically to him concerning Michele's continued jaundiced condition after the child had been taken home. When the baby was about three weeks old, Dr. Price, who "was talking to Dr. Dolan about this baby all during the time of the jaundice," directed that she be brought to his office. After examining Michele, Dr. Price instructed the parents to take her to the laboratory at Arlington Hospital, where blood was withdrawn from the baby. Two other visits were made to the laboratory, on each of which blood was withdrawn from the child for tests. On December 7, a report of a Coombs test, performed by Dr. Dolan on the child's blood, showed that it was negative.

The yellowness in Michele's skin caused by the jaundice continued for "20 to 30 days," after which the skin cleared up, although her eyes and gums were yellow for "nearly four months."

Soon after she was taken home from the hospital, Michele had a

choking spell while her father was giving her water. The parents rushed her to Arlington Hospital, where she was found to be "sleeping nicely" and the parents were told they "might as well take her home."

Michele had another choking spell when she was five weeks old. The parents "thought this was a convulsion" and they "probably called Dr. Price about it." The child continued to have "little seizures" which the mother reported to Dr. Price, who prescribed a medication for the condition.

As Michele's convulsions began to occur more frequently and she displayed other signs of abnormality, the parents became alarmed. When Michele was eight or nine months old, the mother told Dr. Price that she was going to take the child to another pediatrician. Dr. Price suggested, instead, that the child be taken to a neurologist. Accordingly, Michele was examined by Dr. Lambros, a neurologist, after which Dr. Price informed Mrs. Neyland that "he had this report from Dr. Lambros, and that the baby had brain damage."

Michele was examined in September, 1954, by Dr. Jonathan Williams, a neurological surgeon, and, in 1956, by Dr. Oscar Hunter, a pathologist, who was "the one that brought the technique of exchange transfusion ... to this area." It was Dr. Hunter who found, for the first time, that Michele's blood was Rh positive. It was he who first discovered that Mr. Neyland's blood was homozygous Rh positive.

Doctors Williams and Hunter were witnesses at the Neyland trial. Dr. Williams testified that he diagnosed the child as suffering from cortical atrophy (a shrinkage or failure of growth of the brain), generalized kernicterus and convulsions. With regard to his diagnosis of kernicterus, however, Dr. Williams said that he could not "be certain that it was a case of kernicterus."

Dr. Hunter testified that "the possibility certainly exists that this child could have suffered from kernicterus but I couldn't draw that conclusion." When asked if he could say whether or not, "if exchange transfusions had been done, the child would have been benefitted by it," the doctor replied, "Oh no."

Various medications and treatments were prescribed by the doctors and hospitals in an effort to improve Michele's condition. Her condition did not improve, however, but deteriorated. At the time of the trial in Washington, when she was then eight years old, Michele was "a helpless cripple, not being able to see, speak, or move."

Turning now to the present action, we find that when Doctors

McCollum and Price were served with process in the Neyland action in 1956, it was "the first notice that [Aetna] had that a claim was being presented against one of their insureds." Aetna employed John L. Laskey, a competent member of the District bar, experienced and skilled in handling malpractice cases, to represent the doctors. Aetna also assigned an adjuster to the case and instructed him to tell Laskey "that anything [he] wanted they would do."

Laskey and other representatives of Aetna undertook an investigation of the case. The four doctors who were named as defendants in the Neyland action were interviewed on a number of occasions by Laskey and the details of their handling of the Neyland child were secured.

Laskey told the doctors that "the amount of the suit was in excess of the limits of their policies." He discussed with them "their right to have additional counsel" but "didn't discuss the need of additional counsel. [He] didn't feel the need."

Dr. Dolan, the pathologist at Arlington Hospital, also insured by Aetna, was interviewed by Laskey. Laskey tried for several years before he was able to secure authorization from the Neylands' counsel to talk to Doctors Williams and Hunter, who had examined and treated Michele at the request of the parents. When the authorization was finally secured, Laskey interviewed the doctors and learned the full details of their knowledge of Michele's case.

Laskey conferred at length with Dr. Harris, Aetna's full-time surgical adviser, about the case. He consulted with Dr. Edith Potter, a pediatrician of Chicago, and Dr. Lewis K. Diamond, a pathologist of Boston, "among the foremost authorities in the field." Laskey "received an opinion from Dr. Potter that was favorable." Dr. Diamond "was very positive that this was not kernicterus and that it did not result from any failure to . . . exchange transfuse this child during the period it was in the hospital, the first two to five days of life." Dr. Diamond placed marked emphasis "on the lack of clinical symptoms of the Neyland child."

Laskey, at Aetna's request, had Michele examined by Dr. William T. Spence, a neurosurgeon of the District, who reported that Michele was not suffering from kernicterus, but from cortical atrophy, a congenital condition unrelated to kernicterus. The child was also examined, at Laskey's request, by Dr. Frederic G. Burke, a pediatrician of Alexandria. Laskey also consulted Dr. Richard W. Palmer, a pathologist of Alexandria.

Laskey spent "many hours" in a medical library making an "in-

dependent study" of erythroblastosis and kernicterus. He kept Aetna advised as to the development of the case and conferred with the local representatives of the company, one of whom was an attorney, "in many instances."

At the completion of the investigation, Laskey and the representatives of Aetna "reached the conclusion that [Dr. Price] had not been negligent" and evaluated the case as one "of no liability." Aetna established a reserve of $18,000 for the case, covering the four doctors named in the Neyland action, and Dr. Dolan as well. This reserve was "to take care of the exposure of expenses, attorney's fees, and things like that" and not for "a case of liability." The reserve was never changed.

The Neyland action languished on the docket for a number of years. The Neylands' original counsel, Joseph O. Janousek, "never responded" to Laskey's telephone calls. There was "frequent change in associate counsel." Laskey "was in contact with at least four different sets of attorneys associated with Mr. Janousek."

Finally, Laskey filed a motion that the action be dismissed for lack of prosecution or that it be advanced for trial because, in his words, "we were dealing with a technical field in which medical knowledge was advancing every day; that was a factor that I considered was dangerous to the defendants."

The motion to dismiss was denied, but the action was advanced for trial. Richard W. Galiher, a member of the District bar, then entered the case on behalf of the Neylands. On February 7, 1962, he directed a letter to Laskey stating that "I believe that your company should talk settlement." Laskey forwarded a copy of the letter to the four doctors named in the action, as well as Dr. Dolan, and in a covering letter stated that "while I do not seek or desire the assistance of associate counsel, I would have no resentment whatever if any of you should decide to retain counsel of your own selection."

Laskey and Galiher had "some preliminary sparring ... about settlement discussions without any mention of figures." They then met with Chief Judge McGuire, of the District Court, for the purpose of discussing settlement, without success. On February 27, 1962, the day the trial was to commence, Laskey and Galiher met with Judge George L. Hart, Jr., of the District Court, who was assigned to try the case, to discuss settlement.

The details of this latter conference were supplied by Judge Hart, who appeared as a witness at the trial of the present action and testified on behalf of Dr. Price. According to the witness, it was brought out

in the conference that Judge McGuire "had recommended a figure of $67,500." Galiher, on behalf of the Neylands, first demanded $100,000, but then reduced his demand to $75,000. Laskey, according to Judge Hart, said that "he would recommend $45,000." Judge Hart stated, in the conference, that he "thought a figure somewhere between 40 and 50 thousand dollars might be reasonable."

Galiher requested time overnight to talk to his clients. When the attorneys returned to the judge's chambers the next morning, Galiher advised the court that the Neylands would accept $45,000. Judge Hart testified that Laskey then advised him "that his client would not pay that much."

The trial then proceeded, commencing on February 28, 1962, and consuming two weeks of the court's time.

On March 6, during the course of the trial, Dr. Price addressed a letter to Laskey in the following language:

"It is our understanding that you have had the opportunity to settle the case of John F. Nieman, et al. v. Donald C. McCollum, et al. Civil Action No. 4231-56 for a sum within the limits of our insured policy coverage. In the circumstances, we hereby notify you that we will hold you responsible in the event of a judgment in excess of our policy limit.

"The record will disclose that we were agreeable to a settlement of $45,000."

In reply, Laskey, on March 9, addressed a letter to Doctors Detwiler and Price, stating that the doctors had maintained throughout "that there is no liability on your part to these plaintiffs." The letter further stated, "if you have evidence or information of any kind which, in your opinion, makes this a case of liability on your part, the Aetna Company and I both want it immediately." No reply was received by Laskey or Aetna.

The case went to the jury after 4 p.m. on March 8. The jury did not return its verdicts until after 4 p.m. on March 10.

Before we approach a decision of this case, there are a number of evidentiary matters to which we must give our attention.

We find, upon examining the brief filed on behalf of Dr. Price, and thoroughly reading the "Joint Appendix," that considerable liberty has been taken in the brief in interpreting the evidence presented at the trial in Washington. For example, the brief asserts that the evidence showed that although the Coombs test, made of Michele's blood on the day she was born, was negative, a second such test, performed three days after birth, was positive. The brief asserts

that the evidence showed that a zygosity test had been performed on the blood of Mr. Neyland before the birth of Michele, showing that his blood was homozygous Rh positive. The brief asserts that Dr. Price admitted that Michele had erythroblastosis and that he had diagnosed her condition as kernicterus.

It would unnecessarily prolong an opinion which is already lengthy to point out in detail why these assertions are not fairly interpretive of the evidence in the Neyland trial. Suffice to say, that there is simply no satisfactory evidence, by which Dr. Price was bound, set forth in the "Joint Appendix," to support the assertions and they will, therefore, be excluded in our consideration of the case.

We will also exclude from our consideration all testimony relating to the statements of Judge McGuire and Judge Hart, of the District Court, concerning their recommendations of amounts for which the Neyland claim should have been settled. That testimony was inadmissible. Its prejudicial effect was compounded when Judge Hart, himself, departed his bench in Washington, appeared as a witness in the trial of the present action and was permitted to repeat, to the jury, what had been his and Judge McGuire's recommendations. An air of unfairness crept into the trial below when Judge Hart was asked by Dr. Price's counsel, "How did you receive your appointment, Judge?" and Judge Hart replied, "I was appointed by the President, confirmed by the Senate."

■ As has been noted, we have not previously decided whether an insurance company is liable when it refuses to settle a claim against its insured for an amount within the policy limits and a judgment in excess of such limits is thereafter recovered against the insured.

The problem, however, has frequently been before other courts of final jurisdiction and the rule has become firmly established that the insurer may, under proper circumstances, be held liable to the insured for the whole amount of a judgment exceeding the policy limits. 29A Am. Jur., Insurance, § 1444, p. 556; 45 C.J.S., Insurance, § 936, p. 1067, at pp. 1069-1070; 7A Applemen, Insurance Law and Practice, § 4711, p. 551 ff.

The reason for the rule becomes obvious when it is noted that, in the usual liability insurance contract, control of the defense of any claim covered by the contract is vested in the insurer and it is permitted, as the language of the policy before us permitted Aetna, to "make such investigation, negotiation and settlement of any claim or suit as it deems expedient." In such a situation, a relationship of

confidence and trust is created between the insurer and the insured which imposes upon the insurer the duty to deal fairly with the insured in the handling and disposition of any claim covered by the policy. *Olson* v. *Union Fire Insurance Company*, 174 Neb. 375, 118 N.W. 2d 318, 320-323; *Cowden* v. *Aetna Casualty and Surety Company*, 389 Pa. 459, 134 A. 2d 223, 228.

The salutary purpose behind the rule, as displayed by the decided cases, prompts us readily to adopt the rule imposing liability upon an insurer for an excess judgment against the insured for failure to settle within the policy limits, in proper cases.

■ The problem does not end there, however. How is the liability of the insurer for such a failure to be measured?

In the trial court, Aetna was granted instructions which told the jury that its liability to Dr. Price was dependent upon whether it had refused to settle the Neyland claims in bad faith. Dr. Price sought, but was refused, instructions which would have predicated Aetna's liability upon mere negligence alone.

Dr. Price now agrees that the bad faith rule was properly adopted by the trial court. Even so, we must decide if that is the proper measure of liability of an insurer in such circumstances, because the importance of the question transcends this single case.

An examination of the authorities, both case and text, discloses a divergence of opinion upon the subject. It would clearly appear that a majority of the jurisdictions which have passed upon the question favor the bad faith rule.

In a number of jurisdictions, the negligence rule has been adopted. In others, the two rules have been merged into one.

See Annotation, Duty of Liability Insurer to Settle or Compromise, 40 A.L.R. 2d 168.

Bearing in mind that, in situations such as is now before us, the insured has paid a specified premium for a fixed amount of insurance, but balancing against that the extent of the control retained by the insurer of the defense and settlement of any claim, we believe that sound reason compels the adoption of the bad faith rule, rather than the negligence rule, for this type of case. In applying the bad faith rule, the language of the Supreme Court of New Jersey, in the case of *Radio Taxi Service, Inc.* v. *Lincoln Mut. Ins. Co.*, 31 N. J. 299, 157 A. 2d 319, 322, 323, offers appropriate guidelines:

"... [T]he obligation assumed by the insurer with respect to settlement is to exercise good faith in dealing with offers of compromise, having both its own and the insured's interests in mind.

And it may be said also that a reasonably diligent effort must be made to ascertain the facts upon which a good faith judgment as to settlement can be formulated. . . .

". . . A decision not to settle must be an honest one. It must result from a weighing of probabilities in a fair manner. To be a good faith decision, it must be an honest and intelligent one in the light of the company's expertise in the field. Where reasonable and probable cause appears for rejecting a settlement offer and for defending the damage action, the good faith of the insurer will be vindicated. . . ."

Tested by these principles, we now examine the points upon which Dr. Price relies to determine whether the evidence was sufficient to establish the existence of bad faith on Aetna's part in refusing to settle the claim against him.

Dr. Price first contends that Aetna should be held guilty of bad faith for "lack of investigation."

It is difficult to perceive how Dr. Price can sincerely make this contention in the face of the thorough, comprehensive investigation conducted by Aetna, extending over a period of six years.

The gist of Dr. Price's complaint seems to be that Laskey failed to learn that Dr. Williams, who examined and treated Michele Neyland in September of 1954, would testify that the child "did have kernicterus."

This complaint may be answered by a direct quotation from Dr. Price's brief in opposition to granting an appeal, filed in this court:

"To our knowledge there was no evidence introduced against Dr. Price in the District of Columbia case which came as a surprise or which was not known to Aetna or its attorneys."

Moreover, the record shows that in his interview with Dr. Williams, Laskey learned fully what the doctor later testified to in the Washington trial. And it is doubtful that the doctor's statements were sufficient to fix liability for Michele's condition upon Dr. Price.

When pressed by Judge Hart, Dr. Williams said that "based on the reasonable medical certainty of the information at hand," he diagnosed Michele as having kernicterus. But the doctor's testimony showed that there was a great deal of information about Michele's case which he did not have "at hand" when he made his diagnosis and he freely admitted, "I cannot be certain it was a case of kernicterus." And when asked if there was any relationship between Michele's condition and the blood incompatibility, about which the

finger of malpractice was pointed at Dr. Price, Dr. Williams candidly conceded, "I really couldn't establish a relationship."

■ Dr. Price next contends that Aetna evidenced its bad faith because Laskey failed to file a motion *forum non conveniens*, in the District action, so that the case would have to be dismissed and refiled in Virginia, where Dr. Dolan, the pathologist, could be added as a defendant, thus reducing the exposure of Dr. Price.

For the same reason, Dr. Price says Laskey should have filed a third party complaint against Dr. Dolan in the District action and should have submitted Dr. Detwiler, Dr. Price's partner, to the jurisdiction of the District Court.

The contention with respect to the motion *forum non conveniens* is answered by saying that Laskey fully considered filing such a motion, researched the question, discussed it with the doctors and decided that such a motion was not proper. He was supported in his opinion by uncontradicted expert testimony, given in the trial below, that had the motion been filed, it would not have been granted.

With respect to the possible filing of a third party complaint against Dr. Dolan, all that need be said is that Dr. Price has neither alleged nor shown that Dr. Dolan could have been served in the District of Columbia with such a complaint, had it been filed.

Concerning Laskey's failure to submit Dr. Detwiler to the jurisdiction of the District Court, it may be pointed out that Laskey presented this question to the four doctors named in the Neyland action, explained the situation to them and requested that they advise him if such action should be taken. He was never so advised.

■ Dr. Price next contends that Aetna failed to advise him of the opportunity to settle within the policy limits and thus was guilty of bad faith.

It is undisputed that Laskey advised Dr. Price that Galiher, the Neylands' attorney, had instituted settlement negotiations. In the trial below, Laskey testified positively that he advised Dr. Price of the details of the settlement discussions and of Aetna's response to the settlement offer. Dr. Price, when asked if he had been so advised, merely answered, "I don't recall any discussion regarding settlement . . . If I don't recall it how can I either deny or not deny it?"

Moreover, Dr. Price's letter, sent to Laskey during the course of the trial, concerning his position about settlement, conclusively showed that he had knowledge of the settlement negotiations. The letter concluded with the statement, "The record will disclose that we were agreeable to a settlement of $45,000." That statement

could hardly have had reference to anything other than the settlement negotiations, about which Dr. Price now claims he was not advised.

Dr. Price's next contention is that Aetna was guilty of bad faith because it refused to accept the recommendation of its counsel to settle the Neyland claims for $45,000.

Although there was conflict in the trial below as to whether Laskey actually recommended the settlement to Aetna, the jury's verdict resolved that conflict and established as a fact that Laskey did recommend the settlement and that Aetna refused to follow his recommendation.

We have read the cases, cited by Dr. Price in support of this contention, but we must point out that in none of them is the failure of an insurer to accept the settlement recommendation of its attorney, standing alone, sufficient to sustain a charge of bad faith, nor is it sufficient here.

Dr. Price's position here is inconsistent with that taken in connection with his contention, just previously discussed, that he was not advised of the offer to settle for $45,000. His policy provided that his written consent must first be given before Aetna could settle a claim against him. If he did not know of the settlement offer, he hardly could have consented to the settlement, and without such consent Aetna was not free to accept Laskey's recommendation.

Be that as it may, Aetna's refusal to accept Laskey's single recommendation, made when there had been no change whatsoever in the liability picture, was completely consistent with its position throughout that Dr. Price had not been negligent and was not liable to the Neylands. Nothing had occurred, at the time of Laskey's recommendation, which should have changed Aetna's appraisal of its probabilities of success in going to trial.

Aetna's position was also consistent with that taken and constantly maintained by Dr. Price that he had not been negligent and was not to blame for Michele's condition. It does not now behoove Dr. Price to point out in his brief where he was negligent, thus to impose liability upon Aetna for not recognizing his negligence, and then to assert, even as he did in oral argument before the bar of this court, and with some justification, we believe, that he had done no wrong.

The most that can be said of the evidence of Dr. Price's negligence is that it posed a jury question. That must be said because the Neyland case was submitted to the jury and its verdicts were permitted to stand. But that does not mean that Aetna, after an accurate and

complete investigation, aware that if liability was established recovery would exceed the policy limits, heedful of its insured's interests as much as its own, honestly and intelligently weighing the probabilities of success in a trial, acted in bad faith in refusing to settle the Neyland claims.

To the contrary, we are of opinion that the evidence was patently insufficient to show bad faith on the part of Aetna. Accordingly, the judgment appealed from will be reversed and final judgment will be here entered in favor of Aetna.

*Reversed and final judgment.*