BETTIUS & SANDERSON, P.C., Plaintiff–Appellant,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Defendant–Appellee.

BETTIUS & SANDERSON, P.C., Plaintiff–Appellee,

v.

NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA., Defendant–Appellant.

Nos. 87–3036, 87–3043.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 2, 1987.

Decided Feb. 17, 1988.

Rehearing and Rehearing En Banc Denied April 26, 1988.

---

Thomas Phillip Mains, Jr. (Mains & Nichols, Alexandria, Va., Wallace L. Duncan; Duncan, Weinberg & Miller, Washington, D.C., on brief), for plaintiff-appellant.

David P. Durbin (Paul D. Krause, Jayson L. Spiegel, Jordan, Coyne, Savits & Lopata, on brief), Larry Lee Simms (Theodore B. Olson, John A. Mintz, Gibson, Dunn & Crutcher, Washington, D.C., on brief), for defendant-appellee.

Before HALL and MURNAGHAN, Circuit Judges, and BUTZNER, Senior Circuit Judge.

BUTZNER, Senior Circuit Judge:

Bettius & Sanderson, P.C., (Bettius) appeals a judgment entered in favor of its professional liability insurer, National Union Fire Insurance Company. Its two primary assignments of error protest the district court's rulings that compensation paid to principals of a professional corporation is not evidence of corporate net profits, and, second, Virginia law does not authorize an insured to recover punitive damages from its insurance carrier for delaying, in bad faith, to settle a third-party claim. Because compensation paid to a professional corporation's principals is relevant evidence of a professional corporation's net profits, we vacate the judgment of the district court with respect to the claim for compensatory damages and remand the case for further proceedings. We affirm the judgment in favor of National Union on the issue of punitive damages. Other assignments of error and cross-error do not warrant reversal or modification of the district court's judgment.

I

Bettius was a professional corporation engaged in the practice of law in Northern Virginia until early 1986. National Union's lawyers' professional liability policy obligated it to "pay on behalf of [Bettius] all sums which [Bettius] shall become legally obligated to pay as damages because of any claim ... arising out of any act or omission of [Bettius] in rendering or failing to render professional services for others in [Bettius's] capacity as" lawyers. The policy excluded any claim arising out of any employee's fraud, but it waived the exclusion with respect to any insured who did not personally participate in the fraud. The policy provided coverage up to $2,000,000.

Russell Rosenberger, a principal in Bettius, undertook the registration and sale of a highrise condominium building in Alexandria, Virginia. In violation of the Virginia Condominium Act, he failed to file notice of changes in the public offering statements and to furnish information about the changes to purchasers of condominiums.

Twenty-seven purchasers brought suit in equity in a state court against Rosenberger, Bettius, the developer, and others, claiming fraud. Rosenberger notified Na-

tional Union on behalf of Bettius, and National Union engaged an attorney to represent Rosenberger and Bettius in the litigation. On May 10, 1985, after a lengthy bench trial, the court found Rosenberger liable for fraudulently misleading the purchasers and Bettius vicariously liable. The court found that other principals of Bettius were not personally liable. On October 3, the court ordered Rosenberger, Bettius, and the other defendants to repurchase the units sold to the purchasers on November 29, 1985, and to relieve the purchasers of their mortgages in the amount of $1,400,-000 and pay rescission damages of approximately $400,000.

National Union did not advance funds to Bettius or to the purchasers on or before November 29, 1985, the settlement date designated by the court. In the meantime, Bettius retained counsel to represent it in efforts to get National Union to either settle the claim or discharge the judgment.

The state court, after learning that Bettius and the other defendants had not complied with its order, found them to be in contempt, ordered them to pay all day-to-day costs incurred by the purchasers until its order was satisfied, and imposed a fine of $5000 per day, later increased to $10,000 per day, on each defendant for each day that each remained in contempt. Bettius's failure to satisfy the purchasers' claims and the sanctions imposed against it were reported by the press. The court also ordered execution on the judgment. Execution on all of Bettius's assets failed only because of a defect in the writ.

Bettius remained in contempt of court until January 13, 1986. On that date, National Union offered to contribute $400,000 toward settlement of the purchasers' claims. All of the parties agreed to this contribution and settled the claims. The court vacated the fines imposed on Bettius and the other defendants, and the litigation in state court came to an end.

Bettius filed the present action against National Union in the state court, and National Union removed it to the district court. Bettius alleged four claims against National Union: breach of contract, bad faith, fraud, and a violation of 18 U.S.C. § 1961 *et seq.* (1980) (RICO). Bettius claimed, among other things, that because National Union failed to timely satisfy the purchasers' claims, Bettius received adverse publicity which caused it to lose clients and staff and eventually forced it to dissolve on February 1, 1986. It demanded both compensation for lost profits and punitive damages.

To prove damages, Bettius relied in part on a certified public accountant who testified about its gross receipts, some of its expenses, and the amount of compensation it paid to its principals. The accountant testified that Bettius's gross receipts declined dramatically after it received adverse publicity for failing to promptly satisfy the purchasers' claims and that as a result Bettius could not cover its expenses.

At the conclusion of Bettius's case National Union moved for a directed verdict on all counts. The court directed verdicts on the fraud and RICO claims. We find no error in these rulings. Bettius failed to prove the elements of a cause of action for these claims.

With respect to the contract and bad faith claims, National Union argued that the compensation that Bettius paid to its principals was an expense of Bettius and not its net profit because it was operating as a professional corporation, not a partnership. Viewed in this light, National Union contended, Bettius failed to prove damages because it did not present sufficient evidence of its net profit or of its expenses.

The court allowed the breach of contract and bad faith claims to go to the jury, ruling that Bettius had presented sufficient evidence of damages by introducing evidence of gross receipts, expenses, and compensation to principals. The jury returned a verdict for Bettius, awarding $2,000,000 in compensatory and $5,000,000 in punitive damages.

The court granted a motion by National Union for judgment notwithstanding the verdict on the bad faith claim and set aside the punitive damages award, characterizing Bettius's claims as grounded in contract, for which punitive damages are not recov-

erable under Virginia law. It denied National Union's motion for judgment notwithstanding the verdict on the compensatory damages award and instead ordered a new trial on the issue. The court found that National Union breached the insurance contract but concluded that Bettius failed to prove its damages. In reversing its earlier ruling, it held that on retrial evidence of compensation to Bettius's principals would be admitted only as an expense of Bettius and not as evidence of its net profit. Bettius then informed the district court that it believed a new trial would be pointless unless it could introduce evidence of compensation to its principals as proof that it was earning a profit. At Bettius's request, the court entered final judgment in favor of National Union on the breach of contract claim, and this appeal and cross-appeal followed.

## II

Appellate review of an order for a new trial is limited. "It is well settled that 'the granting or refusing of a new trial is a matter resting in the sound discretion of the trial judge, and that his action thereon is not reviewable upon appeal, save in the most exceptional circumstances.'" *Lindner v. Durham Hosiery Mills, Inc.*, 761 F.2d 162, 168 (4th Cir.1985). A party seeking to overturn a new trial order must make a clear showing that the district court abused its discretion. *Wilhelm v. Blue Bell, Inc.*, 773 F.2d 1429, 1433 (4th Cir.1985). It is appropriate to grant this deference to the district court in most cases because the district court "has had the opportunity to observe the witnesses and to consider the evidence in the context of a living trial rather than upon a cold record...." *Massey v. Gulf Oil Corp.*, 508 F.2d 92, 94 (5th Cir.1975).

Appellate review of the district court's order in this case is proper, however. Although the court believed the evidence was sufficient to warrant the jury's findings that National Union breached its contract, the court ordered a new trial on the breach of contract claim because it concluded that the compensation Bettius paid to its princi-

pals was an expense and not evidence of its net profit. Based on this reasoning it held that Bettius failed to prove its net profits and consequent damages for lost profits. The district court's order was based on a conclusion of law and not on factors, such as the credibility of witnesses, that ordinarily would preclude appellate review. Essentially, the court made a ruling on the admissibility of evidence—a legal conclusion that can be reviewed on appeal. "[W]hen the question on which the motion for a new trial is based is a question of law, the action of the trial court is undoubtedly subject to review." *Prichard v. Nelson*, 55 F.Supp. 506, 517 (W.D.Va.1942), *aff'd* 137 F.2d 312 (4th Cir.1943). The legal issue which we may review is whether the compensation paid to Bettius's principals is relevant evidence of its net profits.

## III

Relevant evidence is any "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. All relevant evidence is generally admissible at trial. In this case, the compensation paid to Bettius's principals clearly tends to prove whether Bettius operated profitably, and it is therefore relevant evidence of its net profits. Proof of net profits is material evidence in an action to recover damages for lost profits. *Bristol Belt Line Ry. Co. v. Bullock Electric Mfg. Co.*, 101 Va. 652, 656, 44 S.E. 892, 893 (1903).

National Union argues that when the lawyers at Bettius elected to become a professional corporation for liability and tax reasons they also assumed all of the other characteristics of any business corporation. National Union contends that a professional corporation, like any other corporation, must deduct the compensation it pays to its officers and employees to calculate its net profits and that therefore this compensation should be admissible only to prove expenses.

At first glance, National Union's position is attractive. The problem, however, is

that National Union assumes that professional corporations and business corporations are identical under Virginia law and exist for identical purposes. This is clearly not the case.

In a business corporation, shareholders own a percentage of the corporation but often do not take part in its day-to-day operation and affairs. *See, e.g.,* H. Henn & J. Alexander, *Laws of Corporations,* §§ 71–72 (3d ed. 1983). The corporation pays salaries to its employees, deducts this from its earnings along with other expenses, and arrives at a net profit from which it pays dividends to shareholders in proportion to their percentage of ownership unless it elects to retain the earnings. Employees and shareholders are therefore treated as separate groups of people. *See* J. Moye, *The Law of Business Organizations* § 4.03 (2d ed. 1982).

In a professional corporation, however, the principals and shareholders are not treated as separate groups of people. *See* J. Moye, *The Law of Business Organizations,* § 5.02. Virginia law permits a professional corporation to be formed only by an "individual or group of individuals to render the same professional service to the public for which such individuals are required by law to be licensed...." Va.Code § 13.1–542. Only licensed attorneys may be shareholders of a professional corporation that renders services ordinarily rendered by attorneys. Va.Code § 13.1–544. Because of this fundamental difference, the professional corporation and most other corporations calculate their net incomes with different goals in mind. The law governing nonprofessional corporations developed to accommodate both employees and shareholders who are not employees. After paying employee salaries and expenses, net profits are available to pay dividends to shareholders. This causes the corporation's earnings to be taxed twice—once at the corporate level and again on the shareholders' receipt of dividends. This disadvantage is accepted, however, because the corporate form is essential for the acquisition of capital to finance a business whose employees and shareholders are in theory, and often in fact, not the same. *See* J.

Moye, *The Law of Business Organizations,* § 4.06 at 93.

The aim of a professional corporation is different. In a professional corporation, the shareholders and the principals are, in fact, one and the same. Therefore, the professional corporation desires to disburse its earnings in order to avoid having income taxes imposed twice on what is in reality the same group of people—the principals who are required by law to be both shareholders and professional employees. This is accomplished by distributing all or most of its earnings to the principals as compensation before calculating the professional corporation's net income. The result, of course, is that the corporation's net income for tax purposes is almost always at or near zero, but it is unrealistic to suggest that the corporation is not earning a profit. If we were to treat a professional corporation's net income as its net profit for the purpose of proving loss of profits it would rarely, if ever, show a profit even when its shareholders were earning large incomes. It would never be able to prove damages for lost profits if the wrongful act of another caused it harm. Application of the district court's postverdict ruling that compensation paid to Bettius's principals was a corporate expense and not evidence of net profit would preclude Bettius from showing any loss of future profits. It is precisely for this reason that Bettius advised the district court that a new trial would be futile.

It is indeed true that professional corporations are entitled to take advantage of various tax provisions available to all corporations. *See, e.g., Saxe, Bacon & Bolan, P.C. v. Martindale–Hubbell, Inc.,* 710 F.2d 87, 89 (2d Cir.1983). It is also true that professionals practicing in a professional corporation enjoy limited personal liability for wrongful acts committed by their fellow professionals in the corporation. *See* Va.Code § 13.1–547. Nevertheless, these corporate characteristics cannot be taken to suggest that in an action to recover lost profits the professional corporation must also prove damages in the same manner as any other corporation and end up in almost

every case with little or no recovery. National Union cites no authority that the Virginia legislature intended such a harsh result when it enacted laws authorizing the formation of professional corporations.

We decline to follow *Southern Bell Telephone and Telegraph Company v. Kaminester*, 400 So.2d 804 (Fla.App.1981), on which National Union relies. In that case the court held that compensation paid to the sole shareholder of a medical professional corporation was an expense that must be deducted to compute net profits. Failure to deduct the compensation, the court ruled, rendered the proof of damages for lost profits insufficient as a matter of law. The court, however, did not consider the difference between shareholders in commercial corporations whose dividends are derived from their investment in the company's stock and shareholders in professional corporations whose compensation is derived from the services they render. Nor did the court apply a concept of relevancy similar to the requirements of Federal Rules of Evidence 401 and 402.

The Federal Rules of Evidence embrace a liberal standard favoring the admission of evidence if it has any probative value for proof of a material fact. *Young v. Illinois Central*, 618 F.2d 332, 337 (5th Cir.1980). A professional corporation should not be forced to use the same formula as a commercial corporation if that formula does not accurately or adequately reflect its profits. We therefore conclude that because the compensation paid to principals in a professional corporation tends to prove the corporation's net profit, it is relevant evidence for the purpose of recovering damages for lost profits.

## IV

In its cross-appeal, National Union claims that the district court should have directed a verdict in its favor on the breach of contract count or entered judgment notwithstanding the verdict. It argues that the evidence offered at trial created the inference that Bettius's revenues declined because of a combination of factors, such as client dissatisfaction with the quality of its legal work, Rosenberger's misrepresentations, and the publicity surrounding the suit by the condominium purchasers. It maintains that Bettius failed to prove one of the essential elements of a breach of contract—that National Union's failure to promptly perform proximately caused its injuries.

The standard for granting a motion for a directed verdict is the same as the standard for granting a motion for judgment notwithstanding the verdict. In either case, the district court should consider the record as a whole and in the light most favorable to the party opposed to the motion. "If there is substantial evidence opposed to the motion, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment could reasonably return a verdict for the nonmoving party," the court should deny the motion and submit the case to the jury. *Wyatt v. Interstate & Ocean Transport Co.*, 623 F.2d 888, 891 (4th Cir.1980).

Applying these principles, the district court properly refused to grant National Union's motions for a directed verdict and for judgment notwithstanding the verdict. The record supports the district court's conclusion that the evidence was sufficient for the jury to find that National Union breached its contract.

The question of proximate cause also presented an issue for the jury. Bettius's principals testified that they were unable to devote an adequate amount of time and energy to serving existing clients or attracting new ones because they were preoccupied with the problem caused by National Union's delay in discharging the state court judgment. An accountant testified about Bettius's net profits in the form of compensation paid to its principals: $340,762 in 1983, $443,164 in 1984, and $538,896 in 1985. The evidence also disclosed that after Bettius was held in contempt its gross receipts declined to the point that it could not meet expenses and dissolution became necessary.

The district court properly instructed the jury to award only those damages that were the "direct and natural" result of

National Union's breach. *United Construction Workers v. Laburnum*, 194 Va. 872, 75 S.E.2d 694, *aff'd*, 347 U.S. 656, 74 S.Ct. 833, 98 L.Ed. 1025 (1954), explains the proof required for the award of damages for loss of future profits:

> [I]n Virginia, damages directly and proximately caused by wrongful conduct chargeable to the defendants are collectible, provided they are not uncertain, speculative, or remote. Loss of future profits by the interruption or destruction of an established business, if capable of reasonable ascertainment, may be recovered.
>
> \* \* \* \* \* \*
>
> "Where a regular and established business is injured, interrupted, or destroyed, the measure of damages is the diminution in value of the business by reason of the wrongful act," measured by the loss of the usual profits from the business.

194 Va. at 887, 891, 75 S.E.2d at 704, 707. Application of these principles to the evidence amply supports the district court's refusal to grant a directed verdict or judgment n.o.v. on the ground that Bettius failed to prove proximate cause.

National Union presses its argument, first asserted in the district court, that alternatively it is entitled to a new trial on the issue of compensatory damages because the verdict of $2,000,000 was excessive. The district court had no occasion to consider this issue because it granted a new trial on the ground that compensation paid to principals was an expense rather than evidence of net profits.

National Union is entitled to have the district court rule on its motion to set aside the verdict. On remand, if the district court concludes that the verdict for compensatory damages was not excessive, it should enter judgment on the verdict. If it concludes that the verdict was excessive, the district court may consider the propriety of remittitur. *See* 11 Wright and Miller, *Federal Practice and Procedure*, § 2815 (1973). If the district court deems remittitur inappropriate or Bettius declines to accept the remittitur, the district court should order a new trial. Inasmuch as the evidence was sufficient to support the jury's verdict with respect to liability, a new trial should be limited to the issue of damages. Of course, all proceedings on remand should be conducted with recognition that evidence of the principals' compensation is relevant to prove net profits for the purpose of showing lost profits.

V

■ The district court correctly set aside the punitive damages award of $5,000,000 on the ground that Virginia law does not allow punitive damages when an insurer, in bad faith, delays or fails to satisfy a claim against its insured. The court properly characterized the dispute between Bettius and National Union as nothing more than a breach of contract, for which punitive damages are not recoverable. The district court's ruling is fully supported by *Kamlar Corp. v. Haley*, 224 Va. 699, 299 S.E.2d 514 (1983), which addressed the question "whether a bad motive, underlying a breach of contract, in the absence of an independent, willful tort, will support an award of punitive damages." 224 Va. at 704, 299 S.E.2d at 516. After canvassing Virginia cases, and stating its approval of the rule adopted by most states, the Court held that Virginia law required "proof of an independent, willful tort, beyond the mere breach of a duty imposed by contract, as a predicate for an award of punitive damages, regardless of the motives underlying the breach." 224 Va. at 707, 299 S.E.2d at 518. Two dissenting justices recognized that "no longer in Virginia will punitive damages be allowed in a pure contract action in which the proof shows conduct that evinces malice, wantonness, or oppression." 224 Va. at 711, 299 S.E.2d at 520.

Bettius's action alleged a breach of the fiduciary duty that an insurer owes an insured. This duty was imposed by the contract of insurance. It had no other source. The contractual basis of Bettius's claim is disclosed by the complaint. Bettius alleged that National Union refused to provide adequate representation, to communicate with Bettius, to participate meaningfully to ef-

fect settlement or satisfaction of the judgment, to pay the contempt judgments, and to accept responsibility for the judgments. The complaint also alleged that National Union attempted to shield itself by purportedly accepting an offer of settlement after it was withdrawn. In summary the complaint charges: "National Union's breaches as described above were and are willful, wanton, and malicious, and show complete disregard for the rights of Bettius."

These allegations and the proof that sustained them do not establish that National Union committed an independent willful tort. Although Bettius called National Union's breach "willful, wanton, and malicious," this characterization is of little moment. Quoting W. Prosser, *Handbook of the Law of Torts* § 92 at p. 614 (4th ed. 1971), the Virginia Supreme Court recognized that limiting the remedy for breach of contract to compensatory damages has led to the "more or less inevitable efforts of lawyers to turn every breach of contract into a tort." The Court joined the "overwhelming weight of authority" in resisting this tendency. 224 Va. at 706, 299 S.E.2d at 517.

*Kamlar* denied punitive damages to an employee whose contract of employment was breached "with an ulterior motive, in willful disregard of his rights." 224 Va. at 704, 299 S.E.2d at 516. Nevertheless, its principles apply to contracts of insurance. We followed *Kamlar* in *A & E Supply Co. v. Nationwide Mutual Fire Insurance Co.*, 798 F.2d 669 (4th Cir.1986). In that case the insured filed suit against its insurer after the insurer unreasonably refused to cover losses incurred by the insured in a fire. The district court awarded the insured both the proceeds due under the insurance policy and punitive damages, concluding that the insurer acted in bad faith. We reversed, holding that Virginia would not recognize a separate bad faith claim and award punitive damages in what was in all respects a breach of contract action. 798 F.2d at 676.

There is a difference between this case and *A & E Supply*. *A & E Supply* involved a first-party insurance controversy —that is, the insurance company refused to cover its insured's own losses. The present case is a third-party insurance controversy based on National Union's unjustifiable delay in settling a third party's claim against Bettius. Bettius argues that Virginia would recognize a bad faith claim in a third-party insurance controversy even if it would not recognize a similar claim in a first-party controversy because in a third-party controversy the insurer breaches both the contract and its fiduciary duty to vigorously defend and protect the insured's interests, while in a first-party situation no fiduciary duty exists. It points out that *A & E Supply* relied on a decision reached by the Utah Supreme Court which recognized this distinction, *Beck v. Farmers Ins. Exchange*, 701 P.2d 795 (Utah 1985), and urges us to do the same.

We find no warrant in Virginia law for drawing a distinction between first and third party insurance claims with respect to the disallowance of punitive damages. Dictum in *A & E Supply* rejects the notion that such a distinction is valid. *See* 798 F.2d at 678.

Punitive damages are never awarded to compensate an insured. The function of punitive damages is to punish and deter. *See Kamlar*, 224 Va. at 706, 299 S.E.2d at 517. But this function is achieved by Virginia law without the imposition of punitive damages. The Supreme Court of Virginia has recognized that a contract of liability insurance, which vests in the insurer control of the defense, creates a relationship of confidence and trust between insurer and insured, imposing on the insurer the duty to deal fairly with the insured in the disposition of third-party claims. *See Aetna v. Price*, 206 Va. 749, 760–61, 146 S.E.2d 220, 227–28 (1966). Consequently, if an insurer in bad faith refuses to settle a third-party claim within policy limits or otherwise in bad faith mishandles disposition of the claim, and the claimant obtains a judgment in excess of the policy, the insurer must pay the judgment. Without the imposition of punitive damages, the doctrine of *Price* punishes the insurer for its bad faith by allowing recovery beyond the

policy limits and deters similar conduct by other insurance companies.

Furthermore, as Judge Wilkinson explained in *A & E Supply,* 798 F.2d at 673–76, Virginia has enacted detailed legislation regulating the activity of insurance companies. The Virginia Unfair Insurance Practices Act, Va.Code § 38.1–50 *et seq.,*[*] expressly provided that the penalty for unfair claim settlement practices, including "[n]ot attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear," Va.Code § 38.1–52.9(6), could not exceed $5,000 per violation nor $50,000 over a six-month period. Va.Code § 38.1–55. Also, Va.Code § 38.1–32.1 provided for the allowance of attorney fees to an insured individual if the insurer "has not in good faith either denied coverage or failed or refused to make payment...." These provisions demonstrate that the Virginia legislature has provided for punishment and deterrence without authorizing punitive damages against errant insurance companies.

Bettius also claims that punitive damages are available because a state trial court in Virginia recently held that Virginia would recognize a "tort of bad faith failure to settle a first party insurance claim." *See Hutson v. State Farm Mutual Automobile Insurance Co.,* Law No. 72773 (19th Jud.Cir.Va., June 23, 1986). The court, however, relied primarily on the district court's opinion in awarding punitive damages in *A & E Supply Co. v. Nationwide Mutual Fire Insurance Co.,* 612 F.Supp. 760 (W.D.Va.1985), which we reversed. *See A & E Supply,* 798 F.2d at 678. Later the state trial court, on a motion to reconsider, expressed the view that the court of appeals wrongly decided *A & E Supply.*

For reasons adequately explained in *A & E Supply* and in *Kamlar,* 224 Va. at 699, 299 S.E.2d at 514, we decline to follow the state trial court. Also, we decline to certi-

fy this case to the Virginia Supreme Court. In our opinion *Kamlar, Price, A & E Supply,* and the sections of the Virginia Code that we have cited furnish adequate guidance for the denial of punitive damages.

## VI

Summarizing, we affirm the judgment n.o.v. denying punitive damages. By proving the compensation paid to principals of the professional corporation, Bettius has furnished sufficient proof of the professional corporation's net profits for calculating its damages for lost profits. Accordingly, we vacate the judgment for National Union on the issue of compensatory damages and remand the case for further proceedings outlined in part IV of this opinion.

We find no merit in the other issues presented in the appeal and cross-appeal. Each party will bear its own costs.

AFFIRMED IN PART; VACATED IN PART; AND REMANDED.

MURNAGHAN, Circuit Judge, concurring in part and dissenting in part:

I fully concur in the majority's thoughtful disposition of most of the issues raised in the appeal. However, I disagree with the majority's conclusion in Part V that Virginia does not recognize the tort of "bad faith" in the third-party insurance context. Because I believe that the issue should at the very least be certified to the Virginia Supreme Court for resolution, I dissent from that portion of the majority opinion.

As this Court noted in *A & E Supply Co. v. Nationwide Mutual Fire Insurance Co.,* 798 F.2d 669 (4th Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 1302, 94 L.Ed.2d 158 (1987), the Virginia Supreme Court has expressly stated that in Virginia, a breach of contract may support an award of punitive damages "[o]nly if the breach establishes the elements of 'an independent, wilful tort.'" *Id.* at 672 (quoting *Kamlar Corporation v. Haley,* 224 Va.

---

[*] Title 38.1 of the Virginia Code defined the relations of insured and insurer at pertinent times. Virginia has *since* repealed Title 38.1 and substituted a new insurance code in Title 38.2 of the Virginia Code. Under Va.Code § 1–16, however, this repeal does not "in any way whatever

... affect ... any right accrued, or claim arising before the new law takes effect." With minor variations, Virginia's new insurance code contains identical provisions to the sections of Title 38.1 discussed in this opinion. *See* Va.Code §§ 38.2–510(6); 38.2–218; and 38.2–209.

699, 705, 299 S.E.2d 514, 517 (1983)). I wholeheartedly agree that, as this Court ruled in *A & E Supply*, Virginia does not recognize the tort of bad faith in a *first-party*[1] insurance claim, and that punitive damages are therefore not awardable in that situation. While I am not personally particularly enamored of punitive damages awards, which too often only provide a windfall to a victorious litigant and do not serve much of a public purpose, I recognize that a federal court sitting in diversity is charged with applying state law and not with passing judgment on the wisdom of that law. Because I believe Virginia's recognition of the special fiduciary duty present in the *third-party* context establishes that Virginia law recognizes a tort action alleging a breach of that duty, I think punitive damages can be claimed here by Bettius & Sanderson.

## I.

The Virginia Supreme Court expressly adopted the special fiduciary duty rule in *Aetna Casualty & Surety Co. v. Price*, 206 Va. 749, 146 S.E.2d 220 (1966), where it held that an insurer may be held liable to the insured for the whole amount of a judgment exceeding the policy limits, because

> in the usual liability insurance contract, control of the defense of any claim covered by the contract is vested in the insurer and it is permitted, as the language of the policy before us permitted Aetna, to "make such investigation, negotiation, and settlement of any claim or suit as it deems expedient." In such a situation, a relationship of confidence and trust is created between the insurer and the insured which imposes upon the insurer the duty to deal fairly with the insured in the handling and disposition of any claim covered by the policy.

206 Va. at 760–61, 146 S.E.2d at 227–28. The Virginia Supreme Court later referred to the rule as "the bad faith rule." *Id.* at

761, 146 S.E.2d at 228. The court specifically discussed the choice between a negligence rule and a bad faith rule, and concluded that "sound reason compels the adoption of the bad faith rule, rather than the negligence rule, for this type of case." *Id.*

While I agree that *Aetna Casualty* is not dispositive of this case, because here the plaintiff law firm wants punitive damages for bad faith actions and does not simply seek full satisfaction of a judgment against it, I think the majority unfairly minimizes the importance of the Virginia Supreme Court's ruling. The majority acknowledges that in *Aetna Casualty* "[t]he Supreme Court of Virginia has recognized that a contract of liability insurance, which vests in the insurer control of the defense, creates a relationship of confidence and trust between insurer and insured, imposing on the insurer the duty to deal fairly with the insured in the disposition of third-party claims." *Supra* at 1016. To me, the creation of a special relationship of confidence and trust and the imposition of a special duty necessarily go beyond the usual relationship and duty that are present in any purely contractual situation. The very distinction was articulated by the Utah Supreme Court in *Beck v. Farmers Insurance Exchange*, 701 P.2d 795, 799 (Utah 1985), where the court noted that in the third-party context the insured is "wholly dependent upon the insurer to see that, in dealing with claims by third parties, the insured's best interests are protected." The court also stressed that in many third-party insurance situations, "the insurer controls the disposition of claims against its insured, who relinquishes any right to negotiate on his own behalf." *Id.*[2] Here, the situation is somewhat unusual; it appears that National Union controlled and properly handled the legal defense of its insured, but National Union played almost no role in negotiating and structuring a settlement among the defendants and with

---

**1.** A first-party claim involves an insurer's duty to compensate the insured for direct losses. A third-party claim by contrast concerns the insurer's duty to defend and indemnify the insured against claims by a third party.

**2.** The Utah Supreme Court held in *Beck* that a first-party claimant could not sue his insurer in tort for breaching its duties under the insurance contract. 701 P.2d at 798. Analysis of the first-party/third-party distinction was essential in *Beck* because Utah *does* recognize the tort of

the plaintiffs once the adverse judgment was rendered and refused to satisfy the adverse judgment within the court's deadline. If that conduct constituted a breach of National Union's special fiduciary duty to Bettius & Sanderson, as alleged, then Bettius & Sanderson has made out a tort violation and should be entitled to seek punitive damages.

I disagree with the conclusion reached by the majority, and subscribed to in *dictum* by Judge Wilkinson in *A & E Supply*,[3] that there is no support in Virginia law for the third-party tort claim. In addition to the clear language recognizing a fiduciary duty in *Aetna Casualty*, we have an opinion from a Virginia circuit judge expressing complete disagreement with the conclusion in *A & E Supply* that Virginia does not recognize a tort of bad faith in *first*-party claims. *See Hutson v. State Farm Mutual Automobile Insurance Co.*, Law No. 72773 (19th Jud.Cir.Va., June 23, 1986). While, as the majority notes, Judge Brown in *Hutson* relied heavily on the district court decision in *A & E Supply* that was subsequently reversed by this Court, I do not think that makes Judge Brown's conclusion any less important where we are limited to ascertaining and applying the law of the Commonwealth of Virginia.

When hearing a case pursuant to diversity jurisdiction, a federal court "must determine issues of state law as it believes the highest court of the state would determine them." 19 Wright, Miller & Cooper, *Federal Practice and Procedure* § 4507 at 89 (1982). While the best evidence of how the state's highest court would rule would be relevant holdings of that court, intermediate appellate decisions and even state trial court decisions should be looked to if there are no high court holdings to guide the federal court's inquiry. *Id.* at 94, 96. Although a federal court sitting in diversity is not bound by the ruling of a lower state court, the federal court should defer to the state court unless it has excellent reason to believe the highest state court would rule otherwise if presented with the

question. *See Maryland Casualty Co. v. Burley*, 345 F.2d 138, 139–40 (4th Cir.1965) (Sobeloff, J.) ("A state trial judge, however, has ruled that the clause is void.... While in the absence of a ruling by the highest court of the state we are not bound to follow this decision, we nevertheless join the District Court in deferring to the only available judicial interpretation of Virginia law...."); *cf. Louthian v. State Farm Mutual Insurance Co.*, 493 F.2d 240, 241 (4th Cir.1973).

In a letter opinion denying a Motion to Reconsider in *Hutson*, Judge Brown explicitly rejected this Court's analysis in the appellate decision in *A & E Supply* and reaffirmed his decision:

> I find the reasoning of Judge Williams in *A & E Supply v. Nationwide Mutual Fire Insurance Co.*, 612 F.Supp. 760 (W.D.Va.1985), and that of Judge Turk in *Morgan v. American Family Life Assurance Co. of Columbus*, 559 F.Supp. 477 (W.D.Va.1983) persuasive. In short, I think Judge Wilkinson is wrong.

Letter Opinion, *Hutson* (Brown, J., Dec. 31, 1986). When we sit in diversity, we have a responsibility to ascertain state law. The decisions in *Aetna Casualty* and *Hutson* are strongly indicative of the existence of a tort of bad faith in Virginia in the third-party context.

At the same time, I do not agree with the majority that there are countervailing indications in Virginia law. The majority concludes that punitive damages are unnecessary in Virginia because after *Aetna Casualty*, the insurer may be forced to satisfy a judgment in excess of the policy limit. That may be true in some cases, and in those cases the usual goals of punitive damages (punishment and deterrence) may be met; but where, as here, the eventual judgment against the insured is within the policy limits, the insurer may escape punishment and feel no incentive to honor its special fiduciary duty to its insured. Similarly, while the ability of the Commonwealth of Virginia to impose minor fines on

---

bad faith in the third-party context. *See Ammerman v. Farmer's Ins. Exchange*, 19 Utah 2d 261, 430 P.2d 576 (1967).

**3.** The *holding* in *A & E Supply* dealt exclusively with a first party claim. To reach out and decide what need not be decided is frequently denigrated as *dictum*.

insurers may be a good policy argument in a debate about whether Virginia *should* be held to recognize the tort, the statutory provisions do not provide us with guidance as to whether the tort exists in Virginia.

## II.

While I think this Court could find the existence of the tort of bad faith in the third-party insurance context from existing Virginia law, chiefly from *Aetna Casualty*, the governing precedents are sufficiently sparse that I would certify the question.

The Virginia Supreme Court has the power to answer a question of law certified to it by a United States Circuit Court of Appeals "if a question of Virginia law is determinative in any proceeding pending before the certifying court and it appears there is no controlling precedent on point in the decisions of the Supreme Court or the Court of Appeals of Virginia." Va.Sup.Ct. R. 5:42 (1987). Except for *Aetna Casualty*, which imposes a special fiduciary duty on insurers in the third-party context (the breach of which is logically a tort), there is no precedent from the Supreme Court of Virginia or the Court of Appeals of Virginia to guide us.

The present case is not controlled by *A & E Supply*, because that case dealt with a first-party insurance claim. *A & E Supply*, where additional fiduciary duty did not intrude, was much easier than the instant case. Because the Virginia Supreme Court has adopted the theory of additional fiduciary duty in the third-party context, providing a basis on which the bad faith tort is grounded, we are faced here with a very different case. There is no more to go on for ascertaining Virginia law now than there was last year when the *A & E Supply dictum* was uttered. Absent additional guidance, this Court will largely be speculating about what the Virginia Supreme Court will do when it is squarely presented with the question. We have recognized the appropriateness of certifying such unresolved issues to the highest state court for decision. *See Jones v. Heckler,* 754 F.2d 519, 520 (4th Cir.1985) ("developing and potentially enormously helpful procedure under which certification of unresolved and important questions of [Maryland] state law may be referred to the court best equipped to provide answers to them"). The case satisfies the rule laid down in *Boyter v. Commissioner of Internal Revenue Service,* 668 F.2d 1382 (4th Cir.1981), that a question will not be certified to a state court "unless and until it appears that the answer is dispositive of the federal litigation or is a necessary and inescapable ruling in the course of the litigation." *Id.* at 1385. To decide the appeal, it is necessary to decide an unanswered question of state law: whether Virginia recognizes the tort of bad faith for breaches of third-party insurance contracts.

Because I would certify the far from resolved question of whether Virginia recognizes the tort of bad faith for third-party insurance claims to the Virginia Supreme Court, I respectfully dissent from Part V of the majority opinion.