**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALEXANDRA WOLF, individually and
on behalf of her minor children;
C. W., her minor child; R. W., her
minor child,

*Plaintiffs-Appellants,*

v.

FAUQUIER COUNTY BOARD OF
SUPERVISORS; MIMI DENICOLAS, in
her official and individual
capacities; STEPHANIE DUNCAN, in
her official and individual
capacities; LA'TEEKA TUTWILER, in
her official and individual
capacities; BETH STEPHENS;
CHRYSALIS COUNSELING CENTER,
P.C.; ELIZABETH A. STEVENSON,
Individually, and as the Alter Ego
of Chrysalis Counseling Center,
P.C.; DR. MARK SIMONDS,

*Defendants-Appellees.*

No. 07-2022

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(1:06-cv-00945-JCC)

Argued: December 5, 2008

Decided: February 6, 2009

Before WILLIAMS, Chief Judge, and WILKINSON and GREGORY, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Chief Judge Williams and Judge Gregory joined.

---

**COUNSEL**

**ARGUED:** Earl Neville Mayfield, III, CUCCINELLI & DAY, P.L.L.C., Fairfax, Virginia, for Appellants. Julia Bougie Judkins, TRICHILO, BANCROFT, MCGAVIN, HORVATH & JUDKINS, Fairfax, Virginia; Douglas McNeil Coleman, COLEMAN & RAGLAND, Alexandria, Virginia; John Harvey Craddock, Jr., LECLAIR RYAN, P.C., Richmond, Virginia, for Appellees. **ON BRIEF:** Allyson C. Kitchel, TRICHILO, BANCROFT, MCGAVIN, HORVATH & JUDKINS, Fairfax, Virginia, for Appellees Fauquier County Board of Supervisors, Mimi deNicolas, Stephanie Duncan, and La'Teeka Tutwiler; James R. Kearney, KEARNEY, FREEMAN, FOGARTY & JOSHI, P.L.L.C., Fairfax, Virginia, for Appellees Beth Stephens and Chrysalis Counseling Center, P.C.; Eugenia Vroustouris, LECLAIR RYAN, P.C., Alexandria, Virginia, for Appellee Mark Simonds.

---

**OPINION**

WILKINSON, Circuit Judge:

  Plaintiffs Alexandra Wolf and her two children appeal the district court's grant of summary judgment to various private and public defendants in a case involving the reporting and investigation of suspected child abuse. Plaintiffs allege a

number of violations of state law by Chrysalis Counseling Center, P.C. and its employees, and allege violations of 42 U.S.C. § 1983 by Fauquier County Board of Supervisors and the employees of the Fauquier County Department of Social Services ("DSS"). The claims arise out of a complaint of suspected child abuse made to DSS by Alexandra Wolf's counselor at Chrysalis. Plaintiffs allege that the complaint was false and that DSS failed to adequately investigate the complaint. We affirm the judgment for defendants because the Commonwealth of Virginia has made the protection of children the centerpiece of its child abuse reporting system and its social services apparatus. To impose civil liability in these circumstances would turn that system on its head.

I.

Alexandra Wolf is a single mother of two children who in 2005 resided in Warrenton in Fauquier County, Virginia. At the time of the events at issue in this litigation, her son was eleven years old and her daughter was ten. In the late 1980s and early 1990s, Wolf had problems with panic and anxiety for which she sought mental health counseling. During the early 1990s she also briefly experienced suicidal thoughts.

These problems subsided and Wolf had no further mental health issues until July 2005, when she again began suffering from panic attacks. As a result, Wolf sought treatment at Chrysalis Counseling Center in Culpeper, Virginia. Chrysalis is a Virginia corporation that offers counseling services and employs a psychiatrist, a psychologist, social workers, and licensed professional counselors. Elizabeth Stevenson, a licensed social worker, is the founder and sole shareholder, officer, and director of Chrysalis. Beth Stephens is a "life coach" employed at Chrysalis. She has no advanced training or expertise in mental health. She initially was employed only as the office manager at Chrysalis, but Stevenson chose to designate Stephens as a life coach and gave her some limited training.

On July 27, 2005, Wolf contacted Chrysalis by telephone and requested help dealing with anxiety and panic. The receptionist took down her information on a contact sheet. Stevenson reviewed the contact sheet and assigned Wolf to Stephens. Wolf's first two sessions with Stephens, in which they discussed Wolf's problems with anxiety, occurred without incident.

However, what happened at the end of the third session, on August 17, 2005, is disputed. What the parties do agree on is that this is when events took a strange turn. Wolf claims that she mentioned to Stephens that she had years earlier had suicidal thoughts and had considered ending her life with carbon monoxide poisoning, but that she now recognized those thoughts were foolish. Stephens alleges that Wolf described a plan to kill herself and her children using carbon monoxide on November 1, 2005. Wolf for her part concedes that suicide had been on her mind and that at the least her suicide as a single mother would leave her children dangerously unattended.

Whatever was actually said, it seems clear that Stephens understood Wolf as expressing present intentions to kill herself or her children. And whether Wolf's thoughts had turned to taking her own life or that of her offspring hardly seems dispositive, for the effect on the children would in either case be horrific and surely sufficient to elicit Stephens's concern for their well-being. Stephens, in a self-described state of "shock" at Wolf's description of her suicidal thoughts, excused herself to go speak with Dr. Mark Simonds, a psychiatrist employed by Chrysalis. Simonds instructed Stephens to have Wolf sign a "no-harm contract," a document stating that the signor has no intention to harm herself or others; he also advised Stephens to contact Stevenson and DSS.

Stephens then phoned Stevenson, who reiterated Simonds's advice that Stephens call DSS. Stephens also obtained a copy of a no-harm contract and returned to the room where she had left Wolf. According to Wolf, Stephens asked her several

times whether she planned to hurt herself or her children, and Wolf each time said no. Stephens asked that Wolf sign the no-harm contract. Wolf was reluctant to sign the contract, but ultimately did sign. Stephens claims that Wolf then abruptly left the Chrysalis building. Wolf claims that she left only after Stephens exited the room once Wolf had signed the contract.

Stephens then telephoned DSS, but received a recorded message stating that for urgent matters callers should contact the local sheriff's office. Stephens telephoned Stevenson, who instructed Stephens to contact law enforcement. Stephens then telephoned the Warrenton Police Department and told the dispatcher that she believed Wolf planned to kill herself and her children.

The police department sent an officer to Wolf's residence in order to check on Wolf's safety. When Wolf learned of the officer's visit, she contacted her attorney, David Silek. Silek contacted the police department and stated that Wolf was of sound mind and requested that the police not bother her.

The next morning, August 18, 2005, Stephens and Stevenson spoke with Mimi deNicolas, DSS's program manager, on a conference call. Stephens told deNicolas that Wolf had threatened to kill herself and her children. DSS thus began an investigation. Because the complaint was considered "high priority," two social workers were dispatched that morning to Wolf's home. The social workers found no one at home.

Later that day, two other DSS employees, Stephanie Duncan and Lateeka Tutwiler, were sent to Wolf's home. Duncan and Tutwiler knocked on Wolf's door, but no one answered. However, the DSS employees heard noises inside the house, so they returned to their car and called the police. Wolf had been napping inside; when she awoke and saw a white car in front of her house, she called Silek again. Wolf came outside to speak to Duncan and Tutwiler. Wolf attempted to have Silek speak to Duncan on Wolf's cellphone, but Duncan was

skeptical that Silek was actually an attorney. Silek contacted deNicolas, and they agreed that Silek, deNicolas, and Wolf would meet the next day to discuss the situation. The DSS workers were not permitted to interview Wolf or her children about the details of the complaint while at the residence.

Because the meeting was not scheduled until the next morning, Duncan and Tutwiler told Wolf that they needed to establish a plan to ensure the safety of Wolf's children for the night. The parties agreed that the children would spend the night at the home of Wolf's neighbor. Wolf signed the "safety plan," although she noted on it several objections, and wrote a statement that she was not suicidal and would not hurt her children. The children were placed with the neighbor, who was told to call the police if Wolf attempted to contact the children that night.

The next morning, August 19, 2005, Wolf, Silek, deNicolas, Duncan, and two of Wolf's friends met at Wolf's house. The parties discussed DSS's family assessment process, and Wolf agreed that later that day she would receive an emergency temporary detaining order evaluation by a member of the Community Services Board in order to determine whether she was suicidal or homicidal. Wolf told deNicolas and Duncan that she planned to travel to Florida with her children in the next few weeks. The evaluation was conducted by Annie Holland later that afternoon. In her report, Holland recommended that Wolf continue to seek counseling, and that she allow DSS to monitor her children. However, she did not recommend that Wolf be hospitalized. The children were returned to Wolf after the evaluation.

Later that month, Janis Selbo, deNicolas's supervisor, told deNicolas to contact DSS's attorney, Robert Beard. Selbo was concerned that DSS had not heard from Wolf since the August 19 meeting, and that DSS had never been able to interview Wolf's children. Beard's advice was that DSS go to court to obtain a protective order for the children against

Wolf. Accordingly, Duncan and Tutwiler prepared a petition for each child.

At a September 2, 2005 ex parte hearing in Fauquier County Juvenile & Domestic Relations Court, a judge entered an order for each child appointing Whitson Robinson as the guardian *ad litem* ("GAL"), and requiring that Wolf undergo a psychiatric evaluation, make the children available for interviews with DSS, and allow DSS to provide services to the children. The court continued the matter for one week and scheduled a hearing for September 9.

Wolf had left for Florida on September 1 and was not aware of the September 2 hearing. Silek, having learned of the September 9 hearing from one of Wolf's neighbors, appeared at the hearing. He negotiated an agreement with Beard in which Wolf would allow a friend to have daily contact with her children, and that friend would report to DSS on the children's safety. Wolf also agreed that she would receive a psychiatric evaluation, the children could be evaluated by a social services representative, and the appointment of the GAL would continue.

Pursuant to the agreement, Wolf had daily contact with her friend. She received an evaluation from a psychologist in late September. The children were interviewed by Beverly Dunford, Director of Rappahannock County Department of Social Services on November 4, 2005. In Dunford's view, the children had been "coached," and she was not able to make any assessment about the children. The GAL met with Wolf and her children in January of 2006. He did not file his report until April of 2006. After receiving the GAL's report, DSS had Beard request that the court continue the GAL's appointment. The court denied the request and dismissed the GAL.

On August 16, 2006, Wolf and her children filed an action in the United States District Court for the Eastern District of Virginia, alleging various state law claims against Chrysalis

and Stephens as well as several claims arising under 42 U.S.C. § 1983 against defendants Fauquier County Board of Supervisors, deNicolas, Tutwiler, and Duncan. After the complaint was amended a third time, the district court dismissed Simonds as a defendant for failure to state a claim upon which relief can be granted. The court ultimately granted the remaining defendants' motion for summary judgment on all claims. Plaintiffs timely appealed.

## II.

First, we shall consider the district court's dismissal of the claims against the Chrysalis defendants. At issue here are claims of defamation, breach of contract of confidentiality, negligence, and intentional infliction of emotional distress against Stephens and Chrysalis; negligent hiring against Chrysalis;[1] and medical malpractice against Stevenson and Simonds.

## A.

The claims brought against both Stephens and Chrysalis arise directly out of Stephens's report to DSS. The most serious obstacle to these claims is Virginia's statutory scheme for the prevention of child abuse. Under Virginia Code § 63.2-1509, medical and mental health professionals, social workers, as well as a number of other occupation holders who "have reason to suspect that a child is an abused or neglected child" are legally required to "report the matter immediately to the local department of the county or city wherein the child resides or wherein the abuse or neglect is believed to have occurred or to the Department's toll-free child abuse and neglect hotline." Va. Code § 63.2-1509. Mandatory reporters who fail to notify the authorities are subject to fines. *Id.* A person who is not required to report but who nonetheless

---

[1]Plaintiffs also brought a claim for negligent supervision against Chrysalis, but have not appealed the district court's determination that such a cause of action does not lie under Virginia law.

"suspects that a child is an abused or neglected child may make a complaint concerning such child." *Id.* § 63.2-1510. A child whose parent has threatened to kill the child qualifies under the statute as an "abused or neglected child." *Id.* § 63.2-100.

Under Virginia law, reporters are protected. A person who reports suspected child abuse pursuant to either § 63.2-1509 or § 63.2-1510 "shall be immune from any civil or criminal liability in connection therewith, unless it is proven that such person acted in bad faith or with malicious intent." *Id.* § 63.2-1512. Virginia's scheme is thus highly solicitous of the needs of potentially abused or neglected children. The statutory framework is designed to encourage those who genuinely suspect a child is at risk to report their suspicions to authorities without fear of civil liability.

Plaintiffs argue that § 63.2-1509 "clearly does not apply to layperson reports" like that of Stephens. *Opening Brief of Appellants* at 44. The Chrysalis defendants argue that "as an employee of a licensed counseling center," Stephens is "considered a mandatory reporter." *Brief of Appellees Stevenson, Chrysalis, Stephens & Simonds* at 6. On this point, we shall assume that Stephens is not a mandatory reporter, as she does not appear to be "licensed to practice medicine or any of the healing arts," "employed as a social worker," or a "mental health professional." Stephens has no degree or training in social work or any mental health field, and she has no professional license of any kind. Nor does she fit into any of the other enumerated categories in the statute. Va. Code § 63.2-1509. Even if Stephens were not a mandatory reporter, however, she could hardly be condemned for having some doubt about her status and not wishing to risk criminal penalties for failure to "immediately" report. Va. Code § 63.2-1509.

Stephens's status, however, does not resolve the ultimate question of liability because immunity attaches to both mandatory and voluntary reporters. In fact, the standards for

immunity—a presumptive protection absent bad faith or malice—are the same. *See* Va. Code § 63.2-1512. The main difference between the two types of reporters lies not in the level of immunity provided but rather in the penalty for failure to report, which applies only to mandatory reporters.

We address therefore the standard for immunity. Plaintiffs claim that Stephens made the report to DSS in bad faith. The Virginia Supreme Court has not had occasion to interpret the terms "bad faith" or "malicious intent" in the particular context of § 63.2-1512. The cases interpreting bad faith have largely arisen in the context of insurance law. *See CUNA Mut. Ins. Soc'y v. Norman*, 375 S.E.2d 724, 726-27 (Va. 1989); *State Farm Mut. Auto. Ins. Co. v. Floyd*, 366 S.E.2d 93, 96-97 (Va. 1988); *Aetna Cas. & Sur. Co. v. Price*, 146 S.E.2d 220, 228 (Va. 1966). Those cases, while helpful, are of less than complete utility in the very different field of reporting suspected child abuse. Our deference to the Virginia Supreme Court on matters of state law makes it inadvisable to attempt a comprehensive definition of bad faith in this context. Certain points, however, are self-evident. One is the strong presumption that immunity applies, a presumption that cannot be overcome "*unless it is proven* that such person [the reporter] acted in bad faith or with malicious intent." Va. Code § 63.2-1512 (emphasis added). The burden is placed squarely on the person who would overcome the presumption to prove that immunity should not attach.

In short, the Virginia General Assembly set a high bar for those wishing to strip reporters of suspected child abuse of their statutory immunity. This conclusion is evident from the words chosen by the General Assembly. The words "malicious intent" obviously require some kind of malign motive. As to bad faith, *Black's Law Dictionary* defines the term (outside of the context of insurance law) as "[d]ishonesty of belief or purpose." *Black's Law Dictionary* 149 (8th ed. 2004). Negligence or mistake does not rise to the level of dishonesty. *Cf. Aetna*, 146 S.E.2d at 228 (holding that "sound reason compels

the adoption of the bad faith rule, rather than the negligence rule" in the context of an insurer's refusal to settle a claim). It was open to the legislature to provide a less effective immunity defense by using different language. The statute could have provided that immunity attaches only to those reports that are "reasonable," or "supported by substantial evidence," or "tendered with due care," but the General Assembly used no such terminology.

Whether the standard is thus the subjective one of malicious intent or the more objective one of bad faith, *see State Farm*, 366 S.E.2d at 97, it is plain that Virginia law requires something more than a mistaken report, or a report based on a misunderstanding, or even a report that was negligently tendered. *See Aetna*, 146 S.E.2d at 228. So long as the reporter was acting in the interest of protecting a child rather than out of self-interest or with an intent, for example, to settle some score with the child's parent, the plain intent of the legislature was to allow immunity to attach to the reporter. *Cf. State Farm*, 366 S.E.2d at 97 (to show bad faith refusal to settle by insurer, insured must prove that "insurer acted in furtherance of its own interest, with intentional disregard of the financial interest of the insured").

In other words, the statute provides that immunity will dissolve only in those infrequent circumstances where someone used the reporting system for purposes other than that for which it was designed—namely, the protection of children. It is very clear what the General Assembly wished to do, and we will not make public policy of our own by pursuing a different course—specifically, that of discouraging the reporting of suspected child abuse by exposing either mandatory or voluntary reporters to the significant risk of civil liability. Viewing the evidence in the light most favorable to plaintiffs suggests that Stephens was *at worst* negligent in making the report, and negligence is a far cry from "bad faith."

Plaintiffs have not alleged or suggested any untoward animus, pre-existing bad blood, desire for revenge, or the like

that would strip Stephens of immunity. As the district court noted, plaintiffs have also not suggested "that Stephens was acting only in furtherance of her own interest and with complete disregard for Plaintiffs' interests." J.A. 2414. To the contrary, reporting the incident could well have cost Stephens and Chrysalis a client. While one may dispute exactly what was said in the course of the conversation between Wolf and Stephens the district court found "it is undisputed that Stephens believed Wolf intended to harm her children," that Stephens repeated the same on several occasions, and that she called DSS when told by her superiors of the obligation to do so. J.A. 2413. In any case, no interpretation of events leaves room for the view that Stephens was acting with malicious intent or in bad faith. Plaintiffs suggest that Stephens should have inquired or investigated further and assembled some objective foundation for her report. *See Opening Brief of Appellants* at 41. But the statute makes no mention of such duties of inquiry and investigation, perhaps because in the case of an abused or neglected child there often is no time to investigate, and because investigation is after all the job of DSS.

Because of the nature of the relationship between a patient and a counselor, a rule that immunity could be overcome merely by a patient's disputing the contents of a conversation during a counseling session would gut the reporting statute. Under such a regime, the requirement that a counselor keep the contents of her counseling sessions confidential would make it difficult for the counselor ever to protect herself because it limits her opportunities to establish her version of the record. Such a rule would further put counselors between a rock and a hard place, as they weigh on one hand the risks of harm to a child, and perhaps criminal liability for a failure to report, and on the other the burden of a lawsuit for reporting a suspicion that turned out to be inaccurate. The Virginia legislature sought to resolve the dilemma by encouraging reporting, simply because the failure to do so might leave

children to a tragic fate. We do no more here than respect its choice.

Thus, we find that Stephens and Chrysalis are immune from suit on the defamation, breach of contract of confidentiality, negligence, and intentional infliction of emotional distress claims under Virginia Code § 63.2-1512, as all arise directly out of Stephens's report of suspected child abuse.[2] Summary judgment for defendants on those claims was proper.

## B.

The negligent hiring claim against Chrysalis and the medical malpractice claims against Stevenson and Simonds also arise, albeit indirectly, from the fact of Stephens's report. We need not decide, however, whether the immunity provision in § 63.2-1512 bars these claims, because they fail on other grounds.

First, the negligent hiring claim. Plaintiffs claim that Chrysalis was negligent in hiring Stephens as a life coach when under Virginia law, "one who conducts an activity through employees is subject to liability for harm resulting from the [employee's] conduct if the employer is negligent in the hiring of an improper person in work involving an unreasonable risk of harm to others." *Se. Apts. Mgmt., Inc. v. Jackman*, 513 S.E.2d 395, 397 (Va. 1999). Although the Virginia Supreme Court has never definitively stated what kind of harm suffices

---

[2]It is not entirely clear whether plaintiffs alleged these claims against Stevenson as well. The complaint names only Stephens and Chrysalis on these counts, but plaintiffs' brief treats the claims as if they are made against Stevenson also. *See Opening Brief of Appellants* at 33. The case for liability is weak against Stevenson, however, because Stevenson, as a licensed clinical social worker, is a mandatory reporter under a duty to report immediately suspected child abuse. *See* Va. Code § 63.2-1509. Stevenson, who had known Stephens for some years, further had no reason to doubt the accuracy of her claim.

to make out a claim, other courts have concluded that a serious physical injury to the plaintiff is a required element. *See Parker v. Geneva Enterprises*, 997 F. Supp. 706, 713 (E.D. Va. 1997). *Investors Title Ins. Co. v. Lawson*, 68 Va. Cir. 337, 338 (Henry County 2005). *But see Flanary v. Roanoke Valley SPCA*, 53 Va. Cir. 134, 139 (Roanoke 2000); *Courtney v. Ross Stores, Inc.*, 45 Va. Cir. 429, 430 (Fairfax County 1998).

The Virginia Supreme Court cases upholding a cause of action for negligent hiring involved physical injuries. *See J. v. Victory Tabernacle Baptist Church*, 372 S.E.2d 391 (Va. 1988); *Davis v. Merrill*, 112 S.E. 628 (Va. 1922); *Weston's Adm'x v. Hospital of St. Vincent of Paul*, 107 S.E. 785 (Va. 1921). Although the Virginia Supreme Court would certainly be free to adopt a broad definition of harm extending beyond physical injury as an element of negligent hiring, we decline to do so on our own. Because there is no allegation that Wolf or her children suffered any physical harm as a result of Chrysalis's decision to hire Stephens, or that there was any reason for Chrysalis to think that hiring Stephens would create a risk of physical harm to anyone, summary judgment was properly granted for Chrysalis on the claim for negligent hiring.

Next, we turn to the medical malpractice claim. Under Virginia law, "a physician's liability for malpractice is predicated upon an initial finding that a consensual agreement exists between physician and patient, establishing a relationship from which flows the physician's duty of care." *Harris v. Kreutzer*, 624 S.E.2d 24, 30 (Va. 2006). "A physician's duty arises only upon the creation of a physician-patient relationship . . . . Whether a physician-patient relationship is created is a question of fact, turning upon a determination whether the patient entrusted his treatment to the physician and the physician accepted the case." *Lyons v. Grether*, 239 S.E.2d 103, 105 (Va. 1977).

We agree with the district court that no physician-patient relationship existed between Wolf and either Simonds or Ste-

venson. Wolf signed a contract for life coaching, which is not medical care. She never saw Stevenson or Simonds. Wolf did not agree to receive, and neither Stevenson nor Simonds agreed to provide, "health care" as defined by Virginia's Medical Malpractice Act. *See* Va. Code §8.01-581.1. There is no evidence that Stevenson or Simonds advised Stephens as to the course of treatment for Wolf. When Stevenson and Simonds each advised Stephens to report Wolf's threats to DSS, they were not providing medical advice but rather were giving non-medical professional advice. Because no physician-patient relationship existed, the claim against Simonds was correctly dismissed and summary judgment for Stevenson on the claim against her was properly awarded.

Plaintiffs also face an additional difficulty with respect to these tort actions, namely that a breach of a duty must be the proximate cause of the claimed injury. *Fruiterman v. Granata*, 668 S.E.2d 127, 132 (Va. 2008) (medical malpractice); *Interim Personnel of Cent. Va., Inc. v. Messer*, 559 S.E.2d 704, 708 (Va. 2002) (negligent hiring). We do not believe a reasonable jury could find that any negligence by Chrysalis, Stevenson, or Simonds was the proximate cause of any harm that allegedly arose out of the DSS investigation, for the causal link between the two is simply too attenuated. "The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event, and without which that event would not have occurred." *Beverly Enterprises-Virginia v. Nichols*, 441 S.E.2d 1, 4, (Va. 1994) (quoting *Coleman v. Blankenship Oil Corp.*, 267 S.E.2d 143, 147 (Va. 1980)). We do not believe that the allegedly prolonged DSS investigation resulted "in natural and continuous sequence" from any alleged negligence on the part of Chrysalis, Stevenson, or Simonds. Moreover, the actions of DSS employees constitute intervening causes that break any chain of proximate causation between the alleged negligence and the alleged injury. Thus, for this reason as well the negligent

hiring claim and medical malpractice claims were rightly dismissed by the district court.

## III.

We turn now to the claims under 42 U.S.C. § 1983 against the Fauquier County Board of Supervisors and Fauquier DSS employees deNicolas, Duncan, and Tutwiler.

## A.

We consider first the claims made against Fauquier County. A county may be found liable under 42 U.S.C. § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Plaintiffs contend that Fauquier County should be held liable for DSS's "overriding policy . . . of assuming that abuse complaints are true." *Opening Brief of Appellants* at 62. The County argues that it is not a proper defendant because it did not supervise the individual defendants nor did it make policy for DSS. *Brief of Appellees Fauquier County Board of Supervisors et al.* at 22.

We agree with the County that it was not a proper party. Under Virginia law, the supervision of local social services departments is entrusted to the Commissioner of Social Services and the State Board of Social Services. *Bockes v. Fields*, 999 F.2d 788, 789 (4th Cir. 1993). Counties and cities appoint the members of their local social services boards from a list of eligible candidates provided by the Commissioner; the local boards in turn appoint local directors of social services. Va. Code § 63.2-325. Beyond this limited appointment power, municipalities have no control over the operations of local social services boards or departments. The boards report to the Commissioner and the State Board of Social Services, not to the counties or cities that appoint their members. The poli-

cies followed by Fauquier County DSS are found in the Virginia Code, the Virginia Department of Social Services Manual, and the Virginia Administrative Code—all of which are drafted by the Commonwealth of Virginia, not Fauquier County. Fauquier County did not hire, train, or supervise the individual DSS employees who are defendants.

Plaintiffs argue that Fauquier County is liable because it appointed DSS Director Selbo, who, they contend, has final policymaking authority over the agency. *Opening Brief of Appellants* at 62-63 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481-84 (1986) (opinion of Brennan, J.); *Lytle v. Doyle*, 326 F.3d 463, 472 (4th Cir. 2003)). Contrary to this assertion, the record shows that Selbo serves under the authority of the Social Services Board, and must follow the policies set by the Virginia legislature and the Commissioner of Social Services. Plaintiffs have not adduced any evidence suggesting that the actions of the individual DSS employees in this case followed policies set by Selbo rather than by the Commonwealth of Virginia.

The proper defendant was thus not Fauquier County Board of Supervisors, but rather Fauquier County Social Services Board. Whether the Social Services Board, as an arm of the Commonwealth of Virginia, might assert a successful Eleventh Amendment defense is not before us because plaintiffs did not name the Social Services Board as a defendant. The district court rightly granted summary judgment for the County.

### B.

Finally we turn to the claims against the individual DSS defendants. Plaintiffs allege that in the course of the DSS investigation deNicolas, Duncan, and Tutwiler violated the Wolfs' procedural and substantive due process rights to familial relations guaranteed by the Fourteenth Amendment.[3] They

---

[3]Plaintiffs in their third amended complaint alleged that DSS's removal of the children from Wolf's home on August 18 violated the Fourth

allege that the DSS employees made false allegations against Wolf; rejected Wolf and Silek's attempts to explain that Stephens's report was false; told Wolf she could leave for Florida, but filed for the protective order after she left; refused to investigate Stephens's lack of mental health qualifications or the circumstances of the alleged threat; created a fraudulent affidavit on which Beard relied in obtaining a protective order; insisted that Wolf accept "services" from DSS; and unreasonably opposed the release of the GAL.

No constitutional right was violated in this case. With respect to the procedural due process claim, Wolf points to a number of ways in which she claims the investigation could have been better handled and more quickly resolved. But she cannot show that the investigation did not meet the minimum standards required by procedural due process. Procedural due process provides merely "a guarantee of fair procedures— typically notice and an opportunity to be heard." *Mora v. City of Gaithersburg*, 519 F.3d 216, 230 (4th Cir. 2008) (citing *Zinermon v. Burch*, 494 U.S. 113, 125 (1990); *Goss v. Lopez*, 419 U.S. 565, 579 (1975)) (internal citations omitted). Wolf was not denied the right to be heard; indeed, the DSS employees went out of their way to try to interview and otherwise obtain information about the safety of Wolf's children and were stonewalled by Wolf and her attorney.

In a sense plaintiffs' claim is the opposite of most procedural due process claims. Where most plaintiffs allege that government officials act too precipitously and without adequate information in depriving a plaintiff of a protected interest, in this case plaintiffs allege that DSS sought too much

Amendment and the Due Process Clause of the Fourteenth Amendment. However, plaintiffs now state that "[n]o one would plausibly claim that the DSS social workers were not entirely reasonable in initially responding to the report . . . that Wolf was contemplating suicide and posed a danger to her children" and concede that the removal was reasonable. *Opening Brief of Appellants* at 65.

information and spent too long investigating. While it is regrettable that Wolf had to spend time addressing an undeniably intrusive inquiry, DSS's investigation, even if imperfect, did not deprive Wolf of due process by denying her the right to make her case.

We also cannot say any substantive due process right was violated by the DSS investigation. The Court made clear in *Lewis* that "only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense,'" 523 U.S. at 846 (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 129 (1992)). Only abuse of power which "shocks the conscience" creates a substantive due process violation. *Id.* The conduct of the individual DSS defendants does not approach the level of shocking the conscience. DSS responded to a complaint suggesting the possibility of serious harm and proceeded to investigate and take steps to assure the safety of children that might have been in danger. Despite plaintiffs' attempts to paint DSS's actions as abusive, the investigation does not seem irregular, let alone conscience-shocking.

Were we to say that DSS's investigation violated due process, we would surely place social services workers in an impossible situation. In the face of a complaint alleging child abuse, DSS employees would have two choices. On the one hand, they could investigate and face § 1983 liability if their investigation was somehow imperfect or the complaint turned out to be unfounded. On the other hand, they could do nothing —and risk tragic consequences such as those illustrated by the facts of *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989), in which social services employees failed to protect a child from being so savagely beaten by his father that the child was rendered profoundly retarded. Surely the Constitution does not require that social services workers be placed in any such dilemma.

Because we find that deNicolas, Duncan, and Tutwiler did not violate any of plaintiffs' constitutional rights, summary judgment on the claims against them was proper.

### IV.

Hard choices surround the issue of suspected child abuse. Virginia's reporting statute and its social services apparatus are both based on the assumption that false positives—mistaken reports of child abuse followed by DSS investigations—are less harmful than false negatives — serious harm to a child that could have been prevented but was not. Thus it is with every legal regime; whenever government seeks to prevent harm before it occurs, it must make difficult tradeoffs between tolerating mistake on the one hand and serious injury on the other. There is no conceivable child abuse prevention policy that both gives government the ability to respond to threats in order to prevent harms before they occur yet prevents government from investigating before being certain that a perceived threat is real. Policymakers must choose which of these harms is the greater evil.

This case makes concrete the consequences of a false positive. A legal regime that weighed the costs of false positives differently might provide a legal redress for the harm that plaintiffs allege. But because the Commonwealth of Virginia in designing its child abuse reporting scheme and its social services apparatus decided the costs of an occasional mistaken report were far less than the costs of lasting harm to the lives and safety of young children, the judgment must be affirmed.

*AFFIRMED*